Gary PLOOF, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 108, 2012.

Supreme Court of Delaware.

Submitted: July 16, 2013.
Decided: Oct. 30, 2013.

---

Patrick J. Collins (argued), Collins & Roop, Wilmington, Delaware; Kathryn J. Garrison, Schmittinger & Rodriguez, P.A., Dover, Delaware, for appellant.

John Williams, Department of Justice, Dover, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, Justices and STRINE, Chancellor * constituting the Court en Banc.

STEELE, Chief Justice for the Majority:

This appeal addresses whether a defendant received ineffective assistance of counsel during the penalty phase of his first-degree murder trial. We previously rejected the defendant's claims arising from his trial's guilt phase, but we remanded his penalty phase claims for the postconviction judge to reweigh the aggra-

---

* Sitting by designation pursuant to Del. Const. Art. IV § 12.

vating circumstances against the mitigating circumstances established at trial and in the postconviction proceedings.[1] The defendant contends that his attorneys were ineffective because they failed to uncover evidence that the defendant's father sexually abused foster children staying with the defendant's family and also physically abused the defendant himself. We hold that the defendant's attorneys should have investigated certain "red flags" indicating that the defendant's childhood home was not as benign as initially portrayed. We conclude, however, that the attorneys' failures did not prejudice the defendant. Therefore, we AFFIRM the judge's denial of Ploof's postconviction relief petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND [2]

### A. Heidi Ploof's Death and Gary Ploof's Conviction [3]

We described the circumstances surrounding Heidi Ploof's [4] death in our opinion resolving Defendant–Appellant Gary Ploof's direct appeal:

Gary W. Ploof was a U.S. Air Force Staff Sergeant stationed with his wife, Heidi, at Dover Air Force Base during 2001. Beginning that year, Ploof had an affair with Adrienne Hendricks, a colleague with whom he worked part-time at a towing service. Ploof learned that effective November 1, 2001, the U.S. Air Force would provide $100,000 [in] life insurance for military spouses. He was informed that he would be automatically enrolled unless he took affirmative action to disenroll. Ploof told his supervisor of his intent to refuse the policy coverage, but he took no action to do so. Ploof also told Hendricks that she should plan to move in with him starting November 5, 2001 because he and Heidi were having marital problems, and Heidi was preparing to move out.

In truth, Heidi was not planning to move out nor did Ploof have any intention of rejecting the spousal U.S.A.F. life insurance coverage. Instead, Ploof intended to murder his wife soon after the life insurance policy became effective on November 1. On November 3, 2001, Ploof drove with Heidi to the parking lot of Dover Wal–Mart where he shot her in the head with a .357 magnum revolver. He did that in a way that (he believed) would suggest that she committed suicide. He also developed a scheme to mislead the police in the event that a homicide investigation ensued. Security videotape of the Wal–Mart parking lot on the day that Heidi's body was found showed Ploof hurriedly walking away from her vehicle. Ploof also constructed an elaborate alibi by making numerous frantic phone calls feigning his concern for his missing wife. One of the calls prompted a friend to search for Heidi on the dark country roads on which she would have driven home from work. Ploof even called Heidi's cell phone in an

1. *Ploof v. State (Ploof IV )*, 75 A.3d 811, 2013 WL 2422870 (Del.2013).

2. The facts are taken from the record; the trial judge's opinion after Ploof's penalty hearing, *State v. Ploof (Ploof I )*, 2003 WL 21999031 (Del.Super. Aug. 22, 2003); our opinion in Ploof's direct appeal, *Ploof v. State (Ploof II )*, 856 A.2d 539 (Del.2004); the postconviction judge's opinion, *State v. Ploof (Ploof III )*, 2012 WL 1413483 (Del.Super. Jan. 30, 2012); our initial decision in Ploof's postconviction appeal, *Ploof IV*, 75 A.3d 811 (Del. June 4, 2013); and the postconviction judge's decision on remand, *Ploof v. State (Ploof V )*, Cr. ID No. 0111003002 (Del.Super. July 15, 2013).

3. We described Ploof's trial and conviction in greater detail in *Ploof IV*, 75 A.3d at 815–19.

4. This Opinion will refer to Ploof's family members by their first names for clarity. No disrespect is intended.

attempt to deflect suspicion of his involvement. He then hid the murder weapon on his property and asked friends to hold on to another pistol and a gun case so that they would not be found by the police. Finally, he lied to police about his mistress, Hendricks, (suggesting that she was just a friend), about his weapons (maintaining that he owned no pistols), and about a life insurance policy in which Heidi was recently enrolled (insisting that he had no knowledge of the policy).[5]

In 2003, a Superior Court jury convicted Ploof of Murder in the First Degree. Because the State sought the death penalty, the trial judge conducted a penalty hearing in accordance with 11 *Del. C.* § 4209.

## B. The Aggravating and Mitigating Circumstances Presented at the Penalty Hearing

At the penalty hearing, the State sought to prove two statutory aggravating circumstances: (1) "[t]he murder was committed for pecuniary gain" and (2) "[t]he murder was premeditated and the result of substantial planning."[6] In Delaware, the jurors must find unanimously the presence of at least one statutory aggravating circumstance for a defendant to be eligible to receive the death penalty.[7] The State also attempted to establish several nonstatutory aggravating circumstances: (i) Ploof murdered Heidi without provocation, (ii) Heidi was defenseless, (iii) Ploof had a prison disciplinary record and a criminal history, (iv) evidence established that Ploof committed third-degree assault on a for-

mer girlfriend, (v) Ploof would be dangerous in the future, (vi) Ploof intimidated a witness, and (vii) Heidi's death impacted her family.[8]

Ploof's attorneys (Trial Counsel)[9] relied on twelve mitigating circumstances: (i) Ploof's life history, (ii) his relationship with his family members, (iii) his potential positive impact upon his family members, (iv) his history of gainful employment and usefulness as a productive member of society, (v) his potential positive impact on the prison population, (vi) his adjustment to prison life since his incarceration, (vii) his lack of a substantial prior criminal record, (viii) his lack of a criminal record involving violence, (ix) his lack of a prior record of felony convictions, (x) his capability to follow rules and regulations and to do well in a structured environment, (xi) his lack of a future propensity for violence, and (xii) the impact on his loved ones if he were executed.

### 1. The Aggravating Circumstances

During the penalty hearing, the State reiterated the trial evidence that Ploof had murdered Heidi in order to obtain the proceeds from a $100,000 life insurance policy so that he could ameliorate his financial problems. The State also introduced evidence that Ploof had a criminal record for tractor theft, and that the Air Force had reprimanded him for dereliction of duty and punished him for having an adulterous affair. The State also attempted to show that Ploof assaulted a former girlfriend. A prison administrator testified that Ploof's prison record contained

---

5. *Ploof II*, 856 A.2d at 540–41.

6. 11 *Del. C.* § 4209(e)(1)(*o* ), (u).

7. *Id.* § 4209(d)(1).

8. The trial judge granted Trial Counsel's application to preclude argument on Ploof's failure to accept responsibility after concluding

that it improperly commented on Ploof's trial rights.

9. Several attorneys represented Ploof during his trial and direct appeal. For simplicity and clarity, this Opinion will refer to Ploof's attorneys collectively as "Trial Counsel" using the singular "she."

several minor violations and a major violation for possessing a shank (which Ploof claimed he used for engraving). Finally, Heidi's uncle described his niece's generosity and kindness, and he stated that he missed Heidi like he would miss his own daughter.

### 2. Military Service Record and Future Dangerousness Testimony

Trial Counsel's mitigation case emphasized Ploof's military service. Ploof's former supervisor, Keith Frye, testified that Ploof was a "good worker" with an excellent reputation. Frye described the various medals Ploof earned during his lengthy Air Force career, including Ploof's work helping to launch over 3,000 missions in Operation Desert Storm.[10] Frye also noted Ploof's two Air Force Achievement Medals, which Ploof had earned by making emergency repairs to an aircraft in Mogadishu, Somalia, and ensuring the launch and recovery of 126 C–5 missions during Operation Joint Endeavour.[11]

Abraham Mensch, Ph.D., a psychologist, noted that Ploof's record established that Ploof had a commendable career and was a highly effective leader. Mensch also stated that Ploof had no psychiatric disorder that would predispose him to violence and concluded that Ploof would not be a danger to society in prison.

### 3. Shirley Ploof's Mitigating Testimony

Ploof's mother, Shirley Ploof, testified that Ploof's brother, Kevin Ploof, had se-vere mental and physical handicaps as well as behavioral problems throughout his life. She described how Ploof would protect Kevin. She also described Kevin's various medical problems during Ploof's childhood. Shirley further explained that, beginning when Ploof was seven years old, over thirty foster children cycled through the Ploofs' home, although never more than three at any one time. These foster children often had behavioral and psychological issues. Shirley admitted being a strict disciplinarian, stating that "if [Kevin and Ploof] asked for a slap, they got it." Although she admitted spanking the foster children until she was told not to do so, she denied otherwise hitting them. Shirley was very distressed by her son's potential execution, and she planned to move so that she could visit him more often.

### C. The Jury's Recommendation and the Trial Judge's Decision

■ After the testimony concluded, Ploof spoke briefly and expressed remorse for Heidi's death. He said that he was sorry that Heidi would never see her daughter and that he was sorry for both Heidi's family and his family. The jurors then retired to deliberate. After eight hours, the jurors unanimously concluded that Ploof murdered Heidi for pecuniary gain and that the aggravating circumstances outweighed the mitigating circumstances.[12]

---

10. Operation Desert Storm was the response to Iraq's 1990 invasion of Kuwait.

11. Operation Joint Endeavor was a North Atlantic Treaty Organization peacekeeping mission in the former Yugoslavia.

12. Although eleven jurors concluded that the murder was premeditated and the result of substantial planning, one juror disagreed. Thus, this one statutory aggravating circum-stance did not receive the required unanimity to independently justify the death penalty. See 11 Del. C. § 4209(d)(1). However, a jury's lack of unanimity regarding the statutory aggravating factor of premeditation, as required by the statute, does not preclude the sentencing judge from considering such evidence as a nonstatutory aggravating factor as part of his weighing calculus. See, Ortiz v. State, 869 A.2d 285 (Del.2005). In Ortiz this

In his sentencing opinion, the trial judge concluded that Ploof murdered Heidi without provocation and that Heidi was defenseless. The trial judge found that the State had shown that Ploof was disciplined in prison for "minor offenses" and for possessing a shank. The Air Force had also disciplined Ploof for having an extramarital affair. The trial judge noted Ploof's tractor theft and his arrest for conduct that would have established third-degree assault. In addition, the trial judge found that Heidi's death had significantly impacted her relatives. The trial judge rejected the remaining aggravating circumstances.

Turning to the mitigating circumstances, the trial judge concluded that "[t]here are no mitigating circumstances at all which bear upon the particular circumstances or details of the commission of the murder."[13] Trial Counsel had established other mitigating circumstances, however. Ploof grew up in "difficult family circumstances with a physically handicapped and mentally retarded brother," and Ploof's parents, Gerald and Shirley Ploof, devoted much of their time to the foster children who lived in their home. The trial judge found that Ploof had a good relationship with his family members and could positively influence them.

The trial judge credited Ploof's successful military career, noting that Ploof achieved Staff Sergeant (E–5) rank, served nearly twenty years in the United States and abroad, and earned "numerous commendations and service medals."[14] He concluded that Ploof lacked a substantial

criminal record and had adjusted well to prison, although he had a prison disciplinary record. Because of conflicting testimony and the circumstances of Heidi's murder, however, the trial judge found Ploof had failed to establish the "lack of future propensity for violence" mitigating circumstance.

Next, the trial judge concluded that Ploof's execution would seriously impact his loved ones. The trial judge also noted that Ploof had expressed remorse for Heidi's death. But, the trial judge appeared to discount that remorse because Ploof had faked emotional distress to avoid detection after murdering Heidi.

The trial judge gave "great weight" to the jurors' unanimous recommendation that the aggravating circumstances outweighed the mitigating circumstances, although he noted that their conclusion did not bind him.[15] He also independently weighed the evidence and reached the same result, reasoning:

> Here, there were several opportunities for Ploof to abandon his plan of murder but at every stage of his plan he chose death for Heidi Ploof. He chose death for Heidi Ploof so he could collect insurance on her life. He chose death for Heidi Ploof as part of his plan to live with his mistress. The killing of Heidi Ploof was without any pretext of moral or legal justification. It was preceded by a course of planning, reflection and calculation that makes this murder especially egregious and cold-blooded.

---

Court affirmed the imposition of the death penalty after a jury, having considered two statutory aggravating factors, unanimously found that the defendant was previously convicted of a violent felony, but found only by a vote of 9–3 the circumstance of premeditation and substantial planning. *Id.* at 304. Although it was not entitled to qualify as a statutory aggravating factor, the trial court found that sufficient evidence existed of pre-

meditation and substantial planning to warrant its use as a nonstatutory aggravating factor. *Id.* at 308.

**13.** *Ploof I*, 2003 WL 21999031, at *3 (Del.Super. Aug. 22, 2003).

**14.** *Id.* at *4.

**15.** *Id.*

*While there are mitigating circum-stances which have been proved, they are insubstantial when compared to the nature of the crime and the true charac-ter of the defendant as revealed by his crime and by his conduct.*[16]

We affirmed the trial judge's decision on Ploof's direct appeal.[17]

### D. Postconviction Proceedings

In 2005, Ploof filed a *pro se* postconviction relief motion under Superior Court Criminal Rule 61 and was later assigned counsel. Ploof's appointed counsel supplemented the *pro se* postconviction relief motion, but later withdrew because of a conflict of interest. Ploof's next appointed attorney also withdrew without filing anything further. Finally, yet another attorney was assigned, who further amended and supplemented Ploof's motion.

At his postconviction hearing, Ploof highlighted testimony from six former foster children who lived in the Ploof household. These foster children described abuse in the Ploof household (the "child abuse evidence"), which we summarize below.

### 1. The Child Abuse Evidence
#### a. Michelle Miller

Michelle Miller was four years old when she moved to the Ploofs' home. Ploof was seven or eight years older than Miller. During Miller's five-year placement, she recalled one incident involving Ploof's father, Gerald, who once approached Miller while she was watching television and exposed himself to her. Gerald asked Miller if she wanted to touch his genitals and she declined. Miller did not believe that Ploof knew the incident occurred. She thought of Shirley as "[s]trict but nurturing," but did not describe any specific experiences involving Shirley.

#### b. Davia Williams

Davia Williams lived with the Ploof family for two years when she was around fifteen years old. Ploof was one or two years older and seldom spent time in the house while Williams lived there. Williams testified that she avoided Gerald because he gave her a "creepy vibe" and acted "flirty" with another foster child whom he sat on his lap. Gerald's job as a truck driver, however, meant he was often away from the house. Williams described Shirley as a perfectionist who required the children to redo chores if they did not meet her exacting specifications. Shirley yelled at Ploof and the foster children daily, and she once slapped Williams after she stayed at a shopping mall too late. Williams left the Ploofs' home after telling a caseworker about Shirley slapping her.

#### c. Camille Deyo

Camille Deyo lived with the Ploofs for four months when Ploof was eighteen or nineteen years old. She testified that Gerald was "angry," "loud," and "inappropriate" and that Ploof would protect the foster girls by telling them to "take a walk" when Gerald was angry. When Deyo returned from her walks, she could sometimes hear Gerald yelling and Ploof crying. Although Deyo never saw Gerald beat Ploof, she knew Gerald hit him "three [to] four times a week" because she could "hear the hands hitting the flesh." She did not recall Ploof being hospitalized or having bruises after the beatings. Deyo also stated that Gerald would walk around in his underwear and touch her breasts and buttocks. Ploof observed Gerald's conduct and would tell Deyo to leave the house or go to her room to avoid Gerald. Deyo described Shirley as cold and indif-

---

16. *Id.* (emphasis added).

17. *Ploof II,* 856 A.2d 539, 547–48 (Del.2004).

ferent to Gerald's treatment of herself and Ploof during this period.

### d. Christine Ruhmshottel

Christine Ruhmshottel began living with the Ploof family when she was seventeen years old and remained there until she was twenty.[18] When Ruhmshottel began staying in the house, Ploof was twelve years old. She testified that Shirley hit her twice with a closed fist, and that Shirley would bend Ploof's brother Kevin's hand backwards when he did something wrong. After Ruhmshottel became pregnant, Gerald began positioning himself so that Ruhmshottel could see his genitals. When asked whether she ever observed Ploof "following this kind of behavior," she said, "I think one time I noticed it."

### e. Debra Paradowski

Debra Paradowski stayed with the Ploofs between six months and one year during her early teens. Ploof joined the Air Force while Paradowski lived in the house. Paradowski corroborated the other women's statements that Shirley was very strict and forced the girls to redo chores if they were not done to her specifications. Shirley and Gerald fought frequently. Although Paradowski never saw Gerald hitting Ploof, she testified that she could hear Gerald hitting Ploof with a belt in the basement. Paradowski testified that Gerald sometimes rubbed his underwear-covered genitals against her and reached his hand across her breasts. Gerald also offered her money for oral sex, which Paradowski declined. Although Ploof witnessed his parents fighting, Paradowski said that Ploof did not witness any of Gerald's sexual improprieties. Paradowski claimed that caseworkers initially ignored her allegations against Gerald, but that

after she left the home they called her to inquire about Gerald's conduct.

### f. Kimberly Goodwin

Kimberly Goodwin stayed at the Ploofs' home for four years beginning when she was around fourteen years old. Ploof was several years older than Goodwin, who noted that Gerald's job as a truck driver caused him to be gone for "weeks at a time." Goodwin described Gerald as "angry" and "abusive" when he was home. She testified that he fought "constantly" with Shirley about his infidelity, and that Gerald physically abused Shirley when she confronted him about his affair with a sixteen-year-old babysitter. Goodwin also claimed that Gerald would regularly hit Ploof with a closed fist and once threw him down a flight of stairs. Shirley also slapped and hit Ploof, and once broke Kevin's arm by twisting it behind him. Goodwin contended that on her sixteenth birthday, Shirley pressured her to stay at the house of one of Ploof's friends because the friend came from a moneyed, respected family. That evening, Ploof's friend raped her.

Goodwin also stated that Gerald touched her inappropriately and masturbated in plain view. According to Goodwin, Gerald also anally raped her and forced her to perform oral sex on him. This conduct occurred "several dozen[ ]" times. Goodwin witnessed a young girl performing oral sex on Gerald and observed another girl having anal sex with him. Ploof caught Gerald abusing Goodwin and would apologize to her for Gerald's conduct. Goodwin reported Gerald's abuse, but she did not know whether her caseworkers followed up on the information. Gerald allegedly choked Goodwin whenever she told anyone

18. Ruhmshottel chose to stay with the Ploofs after turning eighteen while finishing high school.

of the abuse. Goodwin left the Ploof home in 1984, the same year the State of New York closed the Ploof foster home. Goodwin was told that the Ploofs planned to move to Florida. Despite the abuse she suffered, Goodwin later rented a house in Florida from the Ploofs because she "wanted answers" and because she wanted Shirley's advice on how to care for her sick child because of Shirley's experiences with Kevin.

### g. Doctor Pablo Stewart

Doctor Pablo Stewart, a psychiatrist, testified on Ploof's behalf. Stewart noted that the report describing the Ploofs' foster home's involuntary closure referenced two "indicated reports" involving different foster girls and stated that the reports raised a "huge red flag" regarding the Ploofs' home. He opined that the reports were relevant to a mitigation investigation because they raised concerns about what the Ploofs' home was like while it was a foster home and even before. In Stewart's experience, most death penalty defendants come from very abusive, traumatic backgrounds. Given Gerald's chronic infidelity, the tension between Gerald and Shirley, Ploof's disabled brother, the constant cycle of foster children, Gerald's sexual assaults on foster girls, and the physical abuse of Ploof, Stewart stated that it would not have been possible for a child like Ploof to develop normally. He stated that Ploof witnessed Gerald's sexual abuse of girls and that Ploof and Kevin had suffered physical abuse by Gerald and Shirley, respectively.

Stewart also discussed a 1975 Poughkeepsie Department of Social Services report that described the Department's frustration with Shirley's use of, and requests for, Department funds; noted marital problems between the Ploofs that might lead to the instability of foster relationships; and described Shirley as "extremely defensive" after a foster girl transferred to another home. Stewart opined that the report indicated that the Ploofs had an interest in keeping the foster home open, that Shirley had a "vindictive" nature, and that Gerald and Shirley had marital problems. Stewart also stated that chronic denial of abuse often occurs in people who merely witnessed sexual abuse, as well as those who were direct victims. Stewart thought that Ploof's infidelity could be attributed to "modeling" Gerald's behavior. Stewart was not surprised that adults described Ploof as "immature," prone to embellishment, and a generally difficult person. Stewart further indicated that Ploof's high level of performance in the Air Force was still consistent with the abuse Ploof witnessed.

Stewart stated that the inconsistencies and questions surrounding Ploof's suicide defense were consistent with an inability to perceive reality that was related to the deceit and denial present in the Ploof household. Stewart rejected Ploof's assertion that he had a positive experience growing up. Instead, Stewart believed the foster girls' testimony. Stewart conceded, however, that he could not offer an opinion that Ploof suffered from any mental illness or defect based on the information he (Stewart) had at the time of the hearing.

### 2. Additional Military Service Testimony

Ploof's postconviction counsel also provided a more detailed account of Ploof's Air Force service. John Guilmartin, a military historian, testified about Ploof's service record. Guilmartin described Ploof's position as a "high-pressure job" and highlighted Ploof's superiors' praise for Ploof's "ability to deal with the unforeseen and unexpected." He described Ploof's work in aid of 3,000 missions launched during Operation Desert Storm and noted particular instances where Ploof's swift repairs averted potential problems. Guilmartin

provided further details about military operations in Somalia and Operation Joint Endeavor and Ploof's role in those operations. Ploof consistently received high ratings, although Guilmartin noted that Ploof's ratings suffered when he had an extramarital affair. Guilmartin summarized Ploof's career by calling him a "committed, dedicated[,] competent[,] maintenance man who goes beyond the minimum demands of the job."

Keith Frye, Ploof's former supervisor who testified at the original penalty hearing, did not recall reviewing Ploof's "enlisted performance reports" and stated that he felt unprepared for his trial testimony. Frye also described Ploof's duties and performance reports. Michael Kelty, a former Air Force technical sergeant who supervised Ploof, further detailed Ploof's work and noted that Ploof would assume a shift supervisor's duties when the supervisor was absent. Kelty also reviewed an enlisted performance report that described Ploof's "extraordinary mechanical abilities."

### 3. The Postconviction Judge's Decision and Ploof's Appeal

The postconviction judge denied Ploof's petition for relief.[19] On appeal, we affirmed the judge's denial of Ploof's various guilt phase claims.[20] We did not address Ploof's penalty phase claims, however, because we considered it prudent to afford the postconviction judge an opportunity to elaborate on his conclusion that Trial Counsel's failure to introduce the child abuse evidence and additional military service evidence did not prejudice Ploof.[21] The postconviction judge supplemented his decision, again concluding that the new evidence did not prejudice Ploof.[22] We now address Ploof's remaining claims following remand.

## II. STANDARD OF REVIEW

■ We review a Superior Court judge's decision to deny postconviction relief for an abuse of discretion.[23] When deciding legal or constitutional questions, we apply a *de novo* standard of review.[24]

## III. ANALYSIS

### A. Standards for Ineffective Assistance of Counsel

■ The United States Supreme Court's *Strickland v. Washington* decision established a two-pronged test to determine whether a defendant was denied his Sixth Amendment right to effective assistance of counsel.[25] To establish *Strickland's* first prong, the "defendant must show that counsel's representation fell below an objective standard of reasonableness."[26] "Second, the defendant must show that the deficient performance prejudiced the defense."[27] "This requires

---

19. *Ploof III*, 2012 WL 1413483 (Del.Super. Jan. 30, 2012).

20. *Ploof IV*, 75 A.3d 811, 834 (Del.2013).

21. *Id.* at 833.

22. *Ploof V*, Cr. ID No. 0111003002, at 10 (Del.Super. July 15, 2013).

23. *Swan v. State*, 28 A.3d 362, 382 (Del.2011) (citing *Zebroski v. State*, 12 A.3d 1115, 1119 (Del.2010)).

24. *Id.* (citing *Zebroski*, 12 A.3d at 1119).

25. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While the United States Constitution's Sixth Amendment is not directly applicable to the State of Delaware, the United States Supreme Court has applied the Sixth Amendment to the states through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

26. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.

27. *Id.* at 687, 104 S.Ct. 2052.

852

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."[28]

 When evaluating an attorney's conduct, *Strickland* requires us to use an objective standard of reasonableness based on "prevailing professional norms."[29] We must strive to eliminate the distorting effects of hindsight and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[30]

 A defendant must also establish, in order to show prejudice, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[31] To establish a reasonable probability of a different result, the defendant must show a "probability sufficient to undermine confidence in the outcome," a standard lower than "more likely than not."[32] "[T]he difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' The likelihood of a different result must be substantial, not just conceivable."[33]

## B. Did Trial Counsel's Investigation Fall Below an Objective Standard of Reasonableness?

### 1. Counsel's Duties During the Penalty Phase of a Capital Trial

 When evaluating whether an attorney's actions fell below an objective standard of reasonableness, the United States Supreme Court has noted that American Bar Association (ABA) standards "are guides to determining what is reasonable," but only guides.[34] If an attorney makes a strategic choice "after thorough investigation of law and facts relevant to plausible options," that decision is "virtually unchallengeable" and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[35] That Court has found attorneys deficient, however, where they "abandoned their investigation of [a petitioner's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources."[36]

 Furthermore, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."[37] "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."[38]

28. *Id.*

29. *Id.* at 688, 104 S.Ct. 2052.

30. *Id.* at 689, 104 S.Ct. 2052.

31. *Id.* at 694, 104 S.Ct. 2052.

32. *Id.* at 693–94, 104 S.Ct. 2052.

33. *Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011) (citing *Strickland,* 466 U.S. at 693, 697, 104 S.Ct. 2052).

34. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

35. *Id.* at 690–91, 104 S.Ct. 2052.

36. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted).

37. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

38. *Id.*

The United States Supreme Court has recognized that defense attorneys are "obligat[ed] to conduct a thorough investigation of the defendant's background" when preparing for the penalty phase of a murder trial.[39] The 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the 1989 ABA Guidelines) state that the "investigation should comprise efforts to discover all reasonably available mitigating evidence."[40] The 1989 ABA Guidelines advise counsel to "[c]ollect information relevant to the sentencing phase of trial, including," among other things, "family and social history (including physical, sexual or emotional abuse)."[41]

### 2. Trial Counsel's Failure to Further Investigate Certain "Red Flags" Fell Below an Objective Standard of Reasonableness

██ In this case, Trial Counsel interviewed Gerald, Shirley, and Ploof.[42] Ploof

described a "fine and uneventful" childhood, and Gerald and Shirley similarly reported a "normal, happy childhood." Ploof's personality and psychological evaluations revealed no problems. Although Trial Counsel obtained Ploof's school, criminal, and employment records, she did not further examine Ploof's upbringing. Having been given no reason to believe that problems existed, Trial Counsel *might* have made a "reasonable professional judgment" to cease her investigation that would survive scrutiny under *Strickland's* "strong presumption" that Trial Counsel's conduct provided reasonable professional assistance.[43] If the record contained no more information, we would undoubtedly affirm the postconviction judge's conclusion that Trial Counsel had no "indication of any problems from any source."[44]

But the record before us does not support the postconviction judge's conclusion. While Trial Counsel was seeking mitigating evidence, she called Gerald at his re-

---

**39.** *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citation omitted).

**40.** Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* § 11.4.1(C) (1989) [hereinafter 1989 ABA Guidelines]. The ABA updated its guidance shortly before Ploof's trial and instructed defense attorneys to "locate and interview the client's family members ... and *virtually everyone else who knew the client and his family.*" Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* § 10.7, Commentary (rev. ed. 2003) (emphasis added), *reprinted in* 31 Hofstra L.Rev. 913, 1024 (2003) [hereinafter 2003 ABA Guidelines]. While the United States Supreme Court has chided a federal appellate court for treating the 2003 ABA Guidelines as "inexorable commands" and for evaluating attorneys using guidelines announced long after the relevant trial, *Bobby v. Van Hook*, 558 U.S. 4, 8, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (citations omitted), *Wiggins v. Smith* accepted the 1989 ABA Guidelines' standard requiring counsel to make efforts to "discover *all reasonably available* mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156

L.Ed.2d 471 (2003) (quoting 1989 ABA Guidelines § 11.4.1(C) (1989)). Here, we conclude *infra* that Trial Counsel's investigation fell short of the 1989 ABA Guideline requiring a "thorough" investigation, which the State does not dispute was a well-defined norm. Therefore we do not address whether the 2003 ABA Guidelines' description of counsel's duties represented prevailing professional norms in Delaware at the time of Ploof's trial.

**41.** 1989 ABA Guidelines § 11.4.1(D)(2)(C).

**42.** *Ploof III*, 2012 WL 1413483, at *8 (Del.Super. Jan. 30, 2012). Trial Counsel did not interview Kevin because his disability made interviewing him impossible. App. to Opening Br. A467 ("[Kevin] was mentally handicapped and could not be interviewed.").

**43.** *See Van Hook*, 558 U.S. at 11, 130 S.Ct. 13 ("And given all the evidence [defense counsel] unearthed from those closest to [the petitioner's] upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents.").

**44.** *Ploof III*, 2012 WL 1413483, at *8.

quest. During the ensuing conversation, Gerald expressed regret that he had contacted Trial Counsel and told her that he needed to talk with Shirley before deciding whether to discuss "it." In an email sent after this cryptic conversation, Trial Counsel speculated that "it" might refer to a "family secret[,] *i.e.*, abuse." [45] Gerald never elaborated, however, and Trial Counsel never followed up to seek more information from any collateral source. That is especially troubling, because Gerald and Shirley had obvious incentives to hide child abuse and because Ploof's expert testified that people who witness abuse often deny its occurrence.

Equally troublesome is internal correspondence which indicates that Trial Counsel already suspected that there were problems lurking in Ploof's childhood. Although Ploof and his parents reported a normal childhood, Trial Counsel wondered about the impact that the combination of foster children and Kevin's medical problems had on Ploof's upbringing.

Aside from her suspicions and the troubling conversation with Gerald, Trial Counsel appears to have reviewed an official boarding home study (the "Study")

evaluating the Ploof household. The Study contained the initial evaluation of the Ploof household as well as annual recertification reports. Because it contained independent evaluations of the Ploof household, the Study was a vital source of unbiased information regarding Ploof's childhood. Although Trial Counsel recalled reviewing the Study's initial evaluation,[46] she did not recall seeing the Study's final entry, which read:

> Worker received notification from [Child Protective Services] that there were 2 separate indicated reports against the Ploofs regarding 2 foster girls in their home. Based on these reports, all of the children in the foster home were removed 3/21/84 and the Ploof boarding home will be closed. A 2843 with an involuntary closing code was sent to Albany 4/2/84.[47]

Even if Trial Counsel only received the initial evaluation rather than the entire Study, it would have been apparent that the Study was incomplete. Trial Counsel's obligation to conduct a "thorough investigation of the defendant's background" should have led her to obtain the complete Study, especially considering Trial Coun-

---

45. App. to Opening Br. A373.

46. Linda Zervas (a member of Trial Counsel) testified:

> Q: ... [Y]ou said you saw the survey when the house opened ... and there were no problems. Do you recall saying that?
> A: Right. The initial home study that I saw didn't indicate there were problems. My only notation of that particular study ... is that neither Gerald or Shirley wanted boys, quote, with sexual problems....
>
> ...
>
> Q: Now, on the final page of that document, there's an entry regarding the closing?
> A: Right.
>
> ...
>
> Q: And do you recall seeing that page?

> A: No.
> Q: Would you have seen it separately attached? Not all together as a document?
> A: I'm not sure. I saw[—]you know what, maybe I just didn't get all of it. I'm not sure.

*Id.* at A846–48. The State's Answering Brief conceded that Trial Counsel knew that the State of New York had closed the Ploofs' foster home. Answering Br. 29 (citations omitted) ("[Trial Counsel] did note that the Ploof foster home in New York State was closed in 1984....").

47. Trial Counsel denied having seen a 1984 referral notice describing reports of two incidents that appears to mirror the Study's final entry and a 1975 memorandum expressing concerns about marital discord in the Ploof home. App. to Opening Br. A407–08.

sel's suspicions and Gerald's reference to an unknown "it" that he refused to discuss. If, however, Trial Counsel had the entire Study but failed to read it, that would clearly breach her obligation to conduct a thorough investigation.[48]

We acknowledge the need to avoid the distorting effects of hindsight when evaluating Trial Counsel's performance. Even so, Trial Counsel's suspicions and the Study, combined with Gerald's cryptic comments, compel us to conclude that Trial Counsel fell below an objective standard of reasonableness by failing to investigate further the Ploof foster home. We disavow any attempt to create a rigid rule that a defense attorney is ineffective whenever that attorney fails to uncover potential mitigating evidence, no matter how unapparent. We conclude only that, in these specific circumstances, Trial Counsel needed to do more.[49] Had Trial Counsel reviewed the complete Study or followed up with Gerald, reasonable investigation would have led Trial Counsel to interview the former foster children and thereby uncover the child abuse evidence. For these reasons, the postconviction judge erred by concluding that "[i]t cannot be said that [Trial Counsel's] performance fell below the standard of reasonableness."[50]

■ The postconviction judge's conclusion—that Trial Counsel's focus on Ploof's military service excused her failure to investigate the child abuse evidence—does not withstand close scrutiny.[51] Although Trial Counsel reasonably concluded that Ploof's military service was useful mitigation evidence, "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."[52] Here, because Trial Counsel's investigation was unreasonable, she never knew about the child abuse evidence, and therefore could not have tactically decided to focus on Ploof's military service. Also, there is no tension between presenting evidence of both Ploof's troubled childhood *and* his military service that would support the postconviction judge's conclusion that Trial Counsel reasonably chose between "alternative[s]."[53]

---

48. We recognize that Ploof moved out of Gerald and Shirley's house before the foster home's closure. The home's *involuntary* closure and the reference to "incidents," however, would have allowed Trial Counsel to confront Gerald, Shirley, and Ploof regarding Ploof's childhood and caused Trial Counsel to seek out the former foster children.

49. *Cf. Rompilla v. Beard,* 545 U.S. 374, 389–90, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (rejecting the dissent's argument that the Court had created a "rigid, *per se* " rule that counsel must "do a complete review of the file on any prior conviction introduced," but concluding that the attorneys unreasonably failed to review the petitioner's conviction record despite knowing that the prosecution planned to introduce testimony relating to the conviction in the hearing that would hamstring the defense mitigation theory).

50. *Ploof III,* 2012 WL 1413483, at *8 (Del.Super. Jan. 30, 2012).

51. *See Ploof V,* Cr. ID No. 0111003002, at 2 (Del.Super. July 15, 2013).

52. *Wiggins v. Smith,* 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

53. *Ploof V,* Cr. ID No. 0111003002, at 2; *see also Wiggins,* 539 U.S. at 535, 123 S.Ct. 2527 ("While it may well have been strategically defensible upon a reasonably thorough investigation to focus on [the petitioner's] direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive.").

### C. Did Trial Counsel's Failure to Investigate the Child Abuse Evidence Prejudice Ploof?

■■■ Our conclusion that Trial Counsel performed deficiently by failing to further investigate signs of trouble in the Ploof foster home does not end the inquiry. *Strickland's* two-pronged test requires both deficient performance and resulting prejudice.[54] Thus, if Ploof suffered no prejudice from Trial Counsel's deficiencies, there is no need for a new penalty hearing. Therefore, we next analyze whether Ploof has established prejudice.

### 1. United States Supreme Court Authority Addressing Prejudice During the Penalty Phase of a Capital Murder Trial

■■■ In *Ploof I*, the trial judge stated that "[t]here are no mitigating circumstances at all which bear upon the particular circumstances or details of the commission of the murder."[55] The trial judge correctly concluded, however, that evidence need not justify or explain the defendant's actions to be mitigating.[56] The United States Supreme Court has held that "evidence about [a] defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."[57] This evidence allows the jurors and sentencing judge to "humanize [the defendant] or ... accurately gauge his moral culpability."[58]

Several United States Supreme Court opinions address the issue of whether an attorney's failure to introduce certain "humanizing" mitigating evidence prejudiced a habeas petitioner. In *Williams v. Taylor,* the petitioner murdered a man after the victim refused to lend him a small amount of money.[59] To counter aggravating evidence regarding the petitioner's long history of violent crime (including assault, robbery, and arson), defense counsel pre-

---

54. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

55. *Ploof I,* 2003 WL 21999031, at *3 (Del.Super. Aug. 22, 2003).

56. *See id.* (stating that no mitigating circumstances bore on the "circumstances or details of the commission of the murder" but nonetheless finding that certain "mitigating circumstances have been established").

57. *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *see also Skipper v. South Carolina,* 476 U.S. 1, 4–5, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) ("Although it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed, there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sen-

tence less than death.' " (citations omitted)); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (concluding that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis added)); *Lambright v. Schriro,* 490 F.3d 1103, 1114 (9th Cir.2007) (citing *Tennard v. Dretke,* 542 U.S. 274, 289, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004)) (noting that the United States Supreme Court explicitly rejected a requirement that mitigating evidence have some nexus to the crime in order to find prejudice).

58. *Porter v. McCollum,* 558 U.S. 30, 41, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).

59. *Williams v. Taylor,* 529 U.S. 362, 367–68 & n. 1, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

sented testimony that the defendant was a nice person and that he voluntarily confessed to several unsolved crimes.[60] The Court held that the petitioner had been prejudiced by counsel's failure to introduce evidence that the petitioner's parents had been imprisoned for criminally neglecting him, evidence of severe physical abuse by the petitioner's father and while he was in foster care, evidence that the petitioner was borderline mentally disabled, evidence of the defendant's good conduct while incarcerated, and evidence indicating a low likelihood of future dangerousness.[61] The United States ·Supreme Court noted that the postconviction judge (who presided over the original trial) properly concluded that there was a reasonable probability that the result would have been different.[62]

In *Wiggins v. Smith,* the United States Supreme Court again held that an attorney's inadequate investigation prejudiced a habeas petitioner.[63] In *Wiggins,* the petitioner drowned an elderly woman in the course of ransacking her apartment.[64] At the sentencing hearing, the petitioner's attorney sought to show that the petitioner did not "kill the victim by his own hand," but counsel did not present significant evidence of the petitioner's life history.[65] Postconviction proceedings revealed that the petitioner's mother often left him alone

for days, forcing him to eat paint chips and beg for food.[66] The petitioner's mother had sex while her children slept in the same bed, beat the petitioner for breaking into her locked kitchen, and forced his hand against a hot stove, causing a burn that required hospitalization.[67] After the petitioner entered foster care, he was physically abused and repeatedly raped by members of several foster families and later by his supervisor at a Job Corps program.[68] The Court found that this testimony, combined with the petitioner's borderline mental disability and homelessness, created a reasonable probability that "at least one juror would have struck a different balance." [69] The Court noted that Maryland's then-existing death penalty statute required unanimous verdicts before imposing the death penalty, so the vote of one juror could prevent a death sentence.[70]

The United States Supreme Court also found prejudice in *Rompilla v. Beard.*[71] In that case, the petitioner repeatedly stabbed a man and set his body on fire.[72] At the sentencing hearing, the prosecution focused on the crime's nature and the petitioner's history of felony convictions. The defense argued for residual doubt and presented testimony from the petitioner's son about his love for his father.[73] Defense counsel in *Rompilla* failed, however, to

60. *Id.* at 368–69, 120 S.Ct. 1495 (citations omitted).

61. *Id.* at 395–97, 120 S.Ct. 1495.

62. *Id.* at 396–97, 120 S.Ct. 1495.

63. *Wiggins v. Smith,* 539 U.S. 510, 538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

64. *Id.* at 514, 123 S.Ct. 2527 (citation omitted).

65. *Id.* at 515–16, 123 S.Ct. 2527 (citation omitted).

66. *Id.* at 516–17, 123 S.Ct. 2527 (citation omitted).

67. *Id.* at 517, 123 S.Ct. 2527 (citation omitted).

68. *Id.*

69. *Id.* at 535, 537, 123 S.Ct. 2527 (citations omitted).

70. *Id.* at 537, 123 S.Ct. 2527 (citations omitted).

71. *Rompilla v. Beard,* 545 U.S. 374, 393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

72. *Id.* at 378, 125 S.Ct. 2456.

73. *Id.*

examine the petitioner's file from a previous conviction, which would have led counsel to discover the petitioner's troubled life history.[74] That history revealed that the petitioner's parents were severe alcoholics, and his father beat him and his mother, leaving bruises and black eyes.[75] During a violent fight, petitioner's mother stabbed his father.[76] The petitioner's parents verbally abused him, and his father also locked him in a dog pen filled with excrement.[77] The children attended school in rags and developed severe drinking problems.[78] Tests of the petitioner revealed signs of schizophrenia and a third-grade cognition level.[79] This undiscovered evidence established prejudice.[80]

### 2. Reweighing of the Aggravating Evidence against the Mitigating Evidence Presented at Trial and Discovered in the Postconviction Proceedings

■ Here, we must determine whether Trial Counsel's failure to present the mitigation evidence postconviction counsel discovered prejudiced Ploof. To do that we must "reweigh the evidence in aggravation against the totality of available mitigating evidence."[81] We reweigh the evidence to determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[82]

■ To impose the death penalty in Delaware, the jurors must find unanimously the existence of a statutory aggravating circumstance.[83] When evaluating whether the aggravating circumstances outweigh the mitigating circumstances so as to justify a death sentence, however, the jurors' vote is only advisory.[84] The trial judge who ultimately imposes the sentence need only give the jurors' recommendation the weight the judge "deem[s is] appropriate."[85] Therefore, the vote of one juror cannot determine or alter the sentencing result.[86]

---

**74.** *Id.* at 390–91, 125 S.Ct. 2456.

**75.** *Id.* at 391–92, 125 S.Ct. 2456.

**76.** *Id.* at 392, 125 S.Ct. 2456.

**77.** *Id.*

**78.** *Id.* at 391–92, 125 S.Ct. 2456.

**79.** *Id.* at 391, 125 S.Ct. 2456.

**80.** *Id.* at 393, 125 S.Ct. 2456.

**81.** *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

**82.** *Id.* (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (internal quotation marks omitted).

**83.** 11 *Del. C.* § 4209(d)(1).

**84.** *See id.* (stating that "[t]he jury's recommendation shall not be binding upon the [trial judge]").

**85.** *Id.*

**86.** In *Wiggins,* the United States Supreme Court noted that the relevant statute required the jurors to unanimously conclude that the aggravating evidence outweighed the mitigating evidence before imposing the death penalty and concluded that there was a reasonable probability that "at least one juror would have struck a different balance." *Wiggins,* 539 U.S. at 537, 123 S.Ct. 2527 (citing *Borchardt v. State,* 367 Md. 91, 786 A.2d 631, 660 (2001)). Federal appellate decisions indicate that a "reasonable probability of a different result" can turn on the relevant statute. *See, e.g., Marshall v. Hendricks,* 307 F.3d 36, 103 (3d Cir.2002) (citations omitted) ("*Given the* [state death penalty statute's] *unanimity requirement,* [a] 'reasonable probability of a different outcome' would mean that only one juror need weigh the factors differently...." (emphasis added)).

### i. The Aggravating Circumstances

■ Here, the murder's statutory aggravating circumstance was compelling and powerful—the jury unanimously found that Ploof murdered Heidi for pecuniary gain.[87] Ploof murdered Heidi to gain $100,000 he believed he would receive from the life insurance policy on Heidi. After the murder, while he was seeking to obtain the insurance proceeds, Ploof attempted to deceive the police and his friends through an escalating series of lies and feigned emotion. This heinous murder had no moral or legal justification. As the trial judge aptly noted, Heidi's death was "preceded by a course of planning, reflection[,] and calculation that makes this murder especially egregious and cold-blooded." [88] Although this murder may have involved fewer aggravating circumstances than some other cases, that does not necessarily reduce the strength of the State's case. As the United States Supreme Court recently reminded a federal appellate court, the crucial inquiry is not the "*number* of aggravating factors," but "their *weight*." [89]

Also weighty are several nonstatutory aggravating circumstances. Ploof murdered his defenseless wife with an execution-style gunshot to the head. There is no evidence that Heidi had done anything to provoke Ploof. Heidi's death also significantly impacted her family, who love and miss her.

The trial judge also identified other nonstatutory aggravating circumstances: Ploof's prison disciplinary record, which included possessing a shank; his criminal record for stealing a tractor and conduct that would have established third-degree assault; and his extramarital affair while in the Air Force.[90] The trial judge's conclusion (which described his weighing process) indicates that he assigned little weight to these circumstances.[91] We also conclude that they add negligible weight to the aggravating evidence in this case.

### ii. The Mitigating Circumstances

Trial Counsel presented evidence of Ploof's lengthy Air Force career, drawing attention to his overseas deployments, including to Mogadishu, Somalia, and his involvement in Operations Desert Storm and Joint Endeavor.[92] The jurors and trial judge knew about Ploof's good reputation, his numerous commendations, and his service overseas—such as assisting in the launch of over 3,000 missions in Operation Desert Storm. Although Ploof's postcon-

---

**87.** Ploof did not present significant evidence contesting the major aggravating circumstances during his postconviction hearing and does not argue the issue on appeal.

**88.** *Ploof I*, 2003 WL 21999031, at *4 (Del.Super. Aug. 22, 2003).

**89.** *See Bobby v. Van Hook*, 558 U.S. 4, 13, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (citations omitted) (chiding the Sixth Circuit for focusing on the number of aggravating circumstances rather than their weight, which led the court to overstate the effect additional mitigating evidence might have had on the jury).

**90.** Ploof's extramarital affair might be less significant in light of the child abuse evidence and we therefore accord it no weight in our analysis. It does not appear that the trial

judge considered it relevant to his decision, which focused on the statutory aggravating circumstance. *See Ploof I*, 2003 WL 21999031, at *4.

**91.** *See id.* (focusing on the murder's planned, cold-blooded nature and Ploof's motivation of pecuniary gain when describing the weighing process).

**92.** We do not address whether Trial Counsel's failure to present more detailed military service testimony fell below an objective standard of reasonableness, because, as we explain *infra*, even if Trial Counsel was deficient, there is no reasonable probability that the penalty phase's result would have been any different.

viction counsel presented more colorful, detailed evidence of Ploof's duties, awards, performance reports, and overseas deployments, that evidence was largely cumulative of the evidence presented at trial. The record supports the postconviction judge's conclusion that the new evidence generally added "[a] few more details" to the trial testimony.[93] Ploof's briefing evidences the cumulative nature of the postconviction testimony by highlighting postconviction testimony that mirrors the trial record.[94] After hearing the trial testimony, the jurors found it insufficient to ameliorate the aggravating circumstances. The trial judge found the mitigating evidence collectively "insubstantial" when compared with the aggravating evidence.[95] While the postconviction testimony was more colorful and descriptive, we cannot conclude that it added measurably to the weight that the jurors and sentencing judge gave the trial testimony.

We next turn to the child abuse evidence. The significant child abuse evidence divides into three categories, (1) Gerald's physical abuse, (2) Shirley's physical abuse, and (3) Gerald's sexual abuse. We address each in turn.

Ploof presented evidence that Gerald frequently beat him during his late teenage years and early adulthood. Deyo, Paradowski, and Goodwin heard Gerald beat Ploof, though only Goodwin ever saw Gerald strike Ploof. Deyo and Goodwin indicated that Gerald beat Ploof with his hands, though Paradowski indicated that Gerald would use a belt. Three of the former foster girls stated that the beatings occurred frequently. Goodwin saw Gerald throw Ploof down a flight of stairs once. Goodwin also saw Gerald beat Shirley while fighting with her over his affair with a sixteen-year-old babysitter.

Although Trial Counsel did not discover Gerald's abuse, the jurors and sentencing judge heard evidence that Shirley slapped her children. During the trial's penalty phase, Shirley admitted hitting Ploof and Kevin, noting that "if they asked for a slap, they got it." Shirley also admitted spanking the foster girls. The new evidence indicates that Shirley was a cold, strict, perfectionist who at one point slapped two foster girls and hit a third in the stomach. Shirley also bent Kevin's arm back when she was angry with him, breaking it on one occasion.

The evidence of Shirley once slapping two foster girls and hitting a third is not of material value, because Shirley had already admitted to slapping Ploof and Kevin at trial. Adding new testimony that Shirley also slapped or hit three foster girls once in the course of several years adds little to the evidentiary mix. More significant is evidence that Shirley bent Kevin's arm back and once broke his arm, but neither former foster girl who witnessed this abuse testified that Ploof was aware of it.

The final component of the child abuse evidence is Gerald's sexual abuse. The former foster girls' testimony regarding that abuse covers a broad range. Williams described Gerald's "creepy vibe" and claimed he flirted with another child whom he sat on his lap. Ruhmshottel noticed only that, after she became pregnant, Ger-

---

**93.** *Ploof III,* 2012 WL 1413483, at *16 (Del.Super. Jan. 30, 2012).

**94.** For example, Ploof highlights Guilmartin's description of him as a *"dedicated, committed young airman,"* his involvement in over 3,000 missions in Operation Desert Storm, and Ploof's receipt of two Air Force Achieve-

ment Medals. Opening Br. 40 (citations omitted) (internal quotation marks omitted). As indicated in Part I.B.2 *supra,* however, this evidence was already before the jurors and sentencing judge.

**95.** *Ploof I,* 2003 WL 21999031, at *4.

ald began sitting in a manner that allowed her to see his genitals. When asked whether Ploof "follow[ed] this kind of behavior," Ruhmshottel vaguely replied, "I think one time I noticed it." Miller recalled only one incident involving Gerald during her five years in the home, in which Gerald exposed himself to her and asked her to touch his genitals. Miller did not think Ploof knew about this incident. Deyo testified that Gerald walked around in his underwear in front of her and touched her breasts and buttocks. Ploof, then nineteen years old, knew of that behavior and warned Deyo to avoid Gerald. Paradowski's testimony was similar—Gerald rubbed his underwear-covered genitals against her and reached his hand across her breasts, and he also offered Paradowski money for oral sex. Paradowski stated, however, that Ploof did not witness any of Gerald's improper conduct toward her.

Goodwin's allegations are much more severe than the other girls' descriptions. She alleged that Gerald raped her dozens of times, and that she witnessed two other girls engaging in similar conduct. She noted that Ploof knew of this abuse and that he comforted her. Ploof was near adulthood or an adult at the time of these events.

In determining whether the child abuse evidence would have created a reasonable probability of a different sentencing result, we note first, the former foster girls' testimony about Gerald's abuse of Ploof (as distinguished from the former foster girls) is far less severe than the evidence in *Williams, Wiggins,* and *Rompilla,* which involved abuse of the petitioner himself. In *Williams,* the petitioner presented evidence that his father "severely and repeatedly" beat him, and that foster parents abused him while his parents were incarcerated for criminal neglect of their children. The *Wiggins* petitioner's mother beat him for breaking into her locked kitchen and multiple foster parents also physically abused him. In addition to the physical abuse, the *Wiggins* petitioner was repeatedly raped or sexually abused in multiple foster homes and in the Job Corps, including multiple gang rapes. In *Rompilla,* the petitioner's father would lock him in a feces-filled dog pen and beat the petitioner with a variety of implements when he was very young. Here, in contrast, three of the six former foster girls testified that Gerald beat Ploof—with his hand or a belt. But, there is no testimony or medical record indicating that these beatings led to scars or bruises. Testimony that Gerald once threw Ploof down a flight of stairs is more significant, but there is no evidence that this occurred more than once. The three former foster girls who saw Gerald abuse Ploof testified that Ploof was at or near adulthood while they lived in the house. That is, this physical abuse did not occur in early childhood. Nor is there any testimony that Ploof's parents ever sexually abused *him,* unlike the *Wiggins* petitioner's horrific experience.

Unlike Gerald and Shirley, the *Williams, Wiggins,* and *Rompilla* petitioners' parents severely neglected their children. The petitioner's parents in *Williams* neglected him so severely that they were imprisoned for their conduct. As the United States Supreme Court noted, the *Williams* petitioner's home was covered in trash and excrement, his parents were so intoxicated that they could neither find clothes for their children nor dress them, and the children themselves had to be hospitalized because several were under the influence of whiskey. The *Wiggins* petitioner's mother abandoned him for days, forcing him to beg and eat paint chips to survive. In *Rompilla,* the petitioner attended school in rags, lived

without indoor plumbing, slept without heat, and could not visit other children or speak to anyone by phone. The former foster girls' descriptions of a cold, strict Ploof home falls short of the striking depravation the United States Supreme Court found existed in *Williams, Wiggins,* and *Rompilla.*

Also absent here is evidence of the mental problems the Court found in *Williams, Wiggins,* and *Rompilla.*[96] Stewart did not diagnose Ploof with any mental illness stemming from his childhood. Stewart noted that Ploof exhibited average to low-average intelligence, and he indicated Ploof had "chronic denial" regarding the abuse. In contrast, the petitioners in *Williams, Wiggins,* and *Rompilla* had severe mental problems. The *Rompilla* petitioner suffered from "organic brain damage," and school tests revealed an IQ in the mentally disabled range. Experts linked the *Rompilla* petitioner's troubles to his childhood and concluded fetal alcohol syndrome was a likely cause. The *Williams* and *Wiggins* petitioners were also borderline mentally disabled.

Ploof's new evidence that Gerald and Shirley physically abused people other than Ploof is similarly distinguishable from the facts implicated in United States Supreme Court case law. Evidence that Gerald beat Shirley during an argument regarding Gerald's affair and that Shirley slapped the children, hit one child twice, and once broke Kevin's arm by bending it back, while inexcusable is far less severe than the evidence of abuse the Supreme Court confronted in *Rompilla.* The *Rompilla* petitioner's father's "frequent" beatings left his mother "bruised and black-eyed," and his mother stabbed his father. Gerald's and Shirley's conduct, although deplorable, does not compare in either frequency or severity.

The evidence that Gerald engaged in varying degrees of sexual misconduct with the foster girls and that he raped Goodwin was not present in *Williams* or *Rompilla.* Although the *Wiggins* petitioner's father and several foster families sexually abused him, the evidence of Gerald's misconduct are of lesser mitigating value to Ploof, because Gerald's sexual abuse did not directly involve Ploof.[97] Evidence that a

**96.** *See Rompilla v. Beard,* 545 U.S. 374, 391, 393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citations omitted) (noting that the petitioner's test results pointed to "schizophrenia and other disorders" and school records showed that the petitioner's "IQ was in the mentally retarded range"); *Wiggins v. Smith,* 539 U.S. 510, 534–35, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (finding that evidence of extraordinary abuse, coupled with the petitioner's "diminished mental capacities," established prejudice); *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("Counsel failed to introduce available evidence that [the petitioner] was 'borderline mentally retarded' and did not advance beyond sixth grade in school." (citations omitted)); *see also Sears v. Upton,* — U.S. —, 130 S.Ct. 3259, 3267, 177 L.Ed.2d 1025 (2010) (vacating the Supreme Court of Georgia's decision because it improperly analyzed prejudice and noting that "[a] proper analysis

of prejudice under *Strickland* would have taken into account the newly uncovered evidence of [the petitioner's] 'significant' mental and psychological impairments"); *Porter v. McCollum,* 558 U.S. 30, 43–44, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (holding that the petitioner established prejudice and noting that "the jury might find mitigating the intense stress and mental and emotional toll that [extensive combat experience in the Korean War] took on [the petitioner]" and that the courts did not consider testimony regarding the "existence of a brain abnormality and cognitive defects").

**97.** *See Boyd v. Allen,* 592 F.3d 1274, 1299 (11th Cir.2010) (concluding that undiscovered physical abuse evidence would not have affected the weighing process and noting that the evidence suggested that the majority of the abuse was directed toward the petitioner's sisters).

defendant suffered sexual abuse presents a weightier mitigation case than evidence that other children were abused. That is especially so where, as here, the testimony suggests that Ploof was unaware of much of Gerald's sexual abuse of the foster children. In *Phillips v. Bradshaw*, the Sixth Circuit emphasized this distinction, in holding that a petitioner had not been prejudiced by his counsel's failure to introduce evidence that his father had severely physically and sexually abused his stepsiblings.[98] The court noted that "[t]he overwhelming majority of the additional evidence is evidence of physical and sexual abuse of [the petitioner's] siblings, namely, his half-siblings. There was evidence that [the petitioner's] father sexually abused [his stepsisters] on numerous occasions, but the evidence of sexual abuse of [the petitioner] personally was virtually nonexistent."[99] Again, and to be sure, this does not diminish the gravity of Gerald's alleged rapes of Goodwin, which the postconviction judge properly described as "extreme and vile,"[100] or his misconduct toward the other foster girls. When reweighing the evidence, however, we must keep in mind that *Ploof* is the defendant, not the former foster girls.

The child abuse evidence's significance is further attenuated by the years that had elapsed since the alleged abuse occurred.[101] Ploof joined the Air Force upon reaching adulthood, and he served for nearly twenty years before murdering Heidi. Both Trial Counsel and postconviction counsel emphasized Ploof's Air Force record. Although Stewart testified that Ploof's successful career was still consistent with growing up in an abusive home, the child abuse evidence carries diminished force as the years pass. As the Eleventh Circuit recognized in *Callahan v. Campbell*, "[w]hen a defendant is several decades removed from the abuse being offered as mitigation evidence[,] its value is minimal."[102] We do not brush aside the child abuse evidence as irrelevant. Indeed, the United States Supreme Court has admonished against that.[103] We note only that the evidence's humanizing effect is lessened by the passage of time. That is especially true in this case where there is no discernible relationship between the childhood abuse and Ploof's decision two decades later to murder his wife to obtain $100,000.[104]

---

98. *Phillips v. Bradshaw*, 607 F.3d 199, 218–19 (6th Cir.2010).

99. *Id.* at 218.

100. *Ploof V*, Cr. ID No. 0111003002, at 7 (Del.Super. July 15, 2013).

101. We also note that the testimony indicates that Gerald's physical abuse of Ploof and the most egregious sexual abuse occurred in Ploof's late teens and early adulthood, not in his early childhood.

102. *Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir.2005) (citing *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir.1990)) (reasoning that the physical abuse a habeas petitioner suffered as a child was less weighty when the defendant was thirty-five years old at the time of the murder). In *Callahan* (which dis-

cussed *Williams* and *Wiggins*), there was evidence that the petitioner's father frequently beat and raped his mother and physically abused the petitioner. *Id.* at 920; *see also Newland v. Hall*, 527 F.3d 1162, 1217 (11th Cir.2008) (citing *Callahan*, 427 F.3d at 937) (holding that a petitioner had not been prejudiced by his counsel's failure to present child abuse evidence and noting that several decades had elapsed between the murder and the abuse).

103. *See Porter v. McCollum*, 558 U.S. 30, 43, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).

104. *Cf. id.* (criticizing Florida courts for discounting to irrelevance the petitioner's father's extreme physical abuse, *"especially* when that kind of history may have particular salience for a jury"* evaluating the petitioner's murder of his former girlfriend and her boyfriend (emphasis added)).

### iii. Reweighing the Aggravating Circumstances Against All the Mitigating Circumstances Does Not Establish a Reasonable Probability of a Different Result

■ Having incorporated and reviewed the evidence that postconviction counsel's multiyear investigation uncovered, we conclude that the petitioner has not established a reasonable probability that the penalty hearing's result *would* have been different. Ploof experienced a troubled childhood. After the family opened the home to foster children beginning when Ploof was seven, Ploof's father Gerald engaged in sexual misconduct with several foster girls, although the extent to which Ploof knew of that misconduct is far from clear. When Ploof neared adulthood, he learned that his father would orally and anally rape Goodwin. He also became aware of Gerald's abuse of other foster girls. Ploof grew up with a severely disabled brother, whose arm his mother once broke by bending it back. During Ploof's early adult years, Gerald frequently beat him with a fist and a belt, although no witness testified they observed bruises. Shirley was cold and strict, and occasionally slapped Ploof and the foster girls.

Ploof joined the Air Force soon after reaching adulthood. He had a commendable military career and served his country overseas as a skilled aircraft mechanic. Ploof spent nearly twenty years in the military. His overseas service included several high-stress combat operations, for which he was decorated, though his personal life occasionally affected his work. Despite a minor criminal record and the possession of a shank while in prison, Ploof generally remained law-abiding—until Heidi's murder.

In 2001, however, Ploof murdered his defenseless wife with a close-range shot to her head in a Dover Wal–Mart parking lot. He timed the killing to be shortly after an Air Force life insurance policy on Heidi came into effect. Ploof had chosen to spend the rest of his life with another woman, but instead of divorcing Heidi, he decided to kill her in order to obtain the $100,000 of insurance proceeds. Heidi did nothing to provoke that heinous crime and Ploof claims no moral or legal justification for it. Ploof revealed his cold-blooded nature after murdering Heidi, by immediately carrying out an elaborate scheme to mislead the police and hide the incriminating evidence, all while making inquiries concerning the life insurance. Although Ploof expressed his remorse to the jury after the penalty hearing, he also feigned sadness while attempting to mislead the police and his friends to believe that Heidi had committed suicide.

■ The aggravating circumstances in this case are powerful, and we cannot conclude that there is a reasonable probability that the sum total of the mitigating evidence *would* lead a reasonable sentencing judge or jury to a different result. The child abuse evidence has no nexus to the murder[105] or Ploof's motivations for it.

**105.** While there is no requirement that a causal nexus exist between the mitigating evidence and the crime for a defendant to establish prejudice, mitigating evidence that provides an explanation for a defendant's behavior is more powerful than evidence that does not provide an explanation. *See Detrich v. Ryan,* 677 F.3d 958, 985 (9th Cir.2012) (explaining that a "causal nexus" between an abusive childhood and a murder can provide a "powerful explanation of a defendant's crimes, and that the failure to introduce such evidence can therefore prejudice a defendant"); *Hannon v. Sec'y, Dep't of Corr.,* 562 F.3d 1146, 1157 (11th Cir.2009) (concluding that defense counsel's failure to present evidence of an alleged mental impairment did not prejudice the petitioner, and noting that "[f]urther, no expert presented evidence to establish any nexus between [the petitioner's] alleged mental impairment and his behavior and the crimes").

Nor is it comparable with the humanizing evidence that caused the United States Supreme Court to find prejudice in *Williams*, *Wiggins*, and *Rompilla*. The child abuse evidence occurred decades before the murder, and Ploof suffered from no psychological or mental problems having any bearing on the crime. The significant abuse largely involved persons other than Ploof, and several witnesses testified that Ploof remained unaware of much of that misconduct. Finally, the physical abuse Ploof himself suffered differed by an order of magnitude from the abuse evidence the United States Supreme Court found to be prejudicial in *Williams*, *Wiggins*, and *Rompilla*. Far from being on all fours with those cases, the new evidence Ploof presents pales in comparison. We recognize that the Court never stated that *Williams*, *Wiggins*, and *Rompilla* represented the minimum level of prejudice required to establish ineffective assistance of counsel. But by the same token, the Court has never articulated a rule or principle that *any* undiscovered child abuse evidence *ipso facto* requires a new penalty hearing.

The jury's unanimous recommendation supports our conclusion. The trial judge considered the jury's recommendation. He also independently concluded that the postconviction evidence presented at trial was "insubstantial" in light of the aggravating evidence.[106] That indicates that the balance of aggravating and mitigating evidence was not near equipoise—a circumstance that, in other situations, might allow relatively weak additional evidence to "tip" the proverbial scales and establish a reasonable probability of a different result.[107] Even if the new evidence created a reasonable probability that one juror would have switched sides—and we cannot conclude that it would have—the remaining jurors would have still overwhelmingly recommended the death penalty.[108]

Shorn of its rhetoric, Ploof's argument is implicitly and essentially that undiscovered evidence of child abuse always mandates a new penalty hearing. In our view, no reasonable reading of *Williams*, *Wiggins*, *Rompilla*, and their progeny supports this argument. Rather, newly discovered mitigating evidence must be scrutinized through *Strickland's* framework, under which constitutional prejudice can be found only if the new evidence creates a "reasonable probability that, absent the errors, the sentencer ... *would have concluded* that the balance of aggravating and mitigating circumstances did not warrant death."[109] Despite postconviction counsel's commendable efforts, the new evidence falls far short of the standard the United States Supreme Court's case law establishes.[110] Although the

---

106. *Ploof I*, 2003 WL 21999031, at *4 (Del.Super. Aug. 22, 2003).

107. *Cf. Outten v. Kearney*, 464 F.3d 401, 422–23 (3d Cir.2006) (finding prejudice where the jury recommended the death penalty by a 7–5 vote).

108. *Cf. Wiggins*, 539 U.S. at 537, 123 S.Ct. 2527 (citations omitted) (evaluating case law analyzing the State of Maryland's then-existing death penalty statute, which required unanimity, and concluding that the defendant's "excruciating life history" created a reasonable probability that at least one juror would have "struck a different balance"); *Outten*, 464 F.3d at 410–12, 422–23 (analyz-

ing prejudice under the State of Delaware's death penalty statute and concluding that extreme physical abuse, neurological damage, psychological problems, and substance abuse established prejudice "[b]ecause the jury recommended death by the narrow margin of 7 to 5, [so] persuading even one juror to vote for life imprisonment could have made all the difference").

109. *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (emphasis added).

110. *See Boyd v. Allen*, 592 F.3d 1274, 1299 (11th Cir.2010) (concluding that "the record, including the [physical abuse by a stepfather]

child abuse evidence and additional military service details may arguably have had "some conceivable effect on the outcome of the proceeding,"[111] *Strickland* and its progeny require more. We cannot discern a "reasonable probability" that the addition of the child abuse evidence, plus additional details regarding Ploof's military service "would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed."[112]

In some cases, a defendant's tragic childhood may make all the difference, even cases that involve violent, cruel, or, as here, cold-blooded murders for pecuniary gain. *Rompilla* and *Wiggins* both involved highly inflammatory murders, yet in both cases the United States Supreme Court found prejudice.[113] Each case will necessarily be fact specific. We do not hold that certain murders are by their nature so egregious that humanizing evidence will never establish prejudice. We hold only that the child abuse evidence's relative weakness in *this* case, considering *these* aggravating circumstances, does not.

### D. Other Penalty Phase Claims

■ In his Opening Brief, Ploof also briefly notes two other penalty phase claims raised before the Superior Court and attempts to incorporate his Superior Court briefing by reference.[114] The claims—Trial Counsel's failure to renew an objection to evidence of an unadjudicated crime admitted during the penalty phase and Ploof's mental health expert's failure to provide competent assistance—are described only in explanatory parentheticals following Ploof's citation to his Appendix. As we explained in *Ploof IV*, this type of argument violates Supreme Court Rule 14, which deems arguments waived if the appellant does not argue their merits within the body of his opening brief.[115] Ploof presents no authority to support his argument, does not address the postconviction judge's decision (or indicate how the judge erred), and does not even describe the alleged deficiencies.[116] Ploof has waived these issues and we therefore will not address them.

### E. The Dissent

The dissent accurately notes that:

On November 3, 2011, Ploof shot and killed his wife Heidi with a single bullet to her head in the parking lot of the Dover Wal–Mart. Ploof planned to take the money from a life insurance policy on Heidi that had just come into effect and start a new life with his mistress.

evidence introduced at [the petitioner's] postconviction hearing, does not reveal the kind of abuse or deprivation inherent in other cases where *Strickland* prejudice actually has been found").

**111.** *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052.

**112.** *Id.* at 700, 104 S.Ct. 2052.

**113.** *See Rompilla v. Beard,* 545 U.S. 374, 377, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (reciting that the victim was repeatedly stabbed and set on fire); *Wiggins v. Smith,* 539 U.S. 510, 514, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Wiggins v. State,* 352 Md. 580, 724 A.2d 1, 5 (1999)) (noting that the defendant drowned a seventy-seven-year-old woman in a bathtub).

**114.** Opening Br. 41 ("Mr. Ploof incorporates by reference the other penalty phase claims made by postconviction counsel.").

**115.** *See Ploof IV,* 75 A.3d 811, 821–24 (Del. 2013) (citing Supr. Ct. R. 14(b)(iv)(A)(3)).

**116.** For example, Ploof's parenthetical asserts that "[Trial Counsel's] mental health expert fail[ed] to provide competent assistance" but does not explain the alleged deficiency or make a legal argument that the deficiency violated Ploof's statutory or constitutional rights. *See* Opening Br. 41.

After murdering his wife, Ploof hid the murder weapon and attempted to mislead the police by making phone calls pretending that he did not know why his wife was home late from work. Police arrested Ploof the following day and he was indicted by a grand jury on the charges of Murder in the First Degree and Possession of a Firearm During the Commission of a Felony.

Ploof pled not guilty, and he claimed that his wife had committed suicide in his presence in the parking lot.[117]
A jury convicted Ploof of both charges and at the penalty phase of the trial found unanimously that Ploof murdered his wife for pecuniary gain—a statutory aggravating factor which made Ploof eligible for the death penalty.[118]

Against the above backdrop, the dissent weighs the additional mitigating evidence stemming from Ploof's dysfunctional childhood home against the aggravating factors. The dissent concludes that there is a reasonable probability that a reasonable sentencer would decide that the mitigating evidence properly admitted would outweigh the aggravating factors and result in the imposition of a life sentence.

We will now explain why we cannot join the dissent's ultimate conclusion.

First, the Dissent concludes its thoughtful and measured analysis by stating that: "This is a classic situation where a reasonable jury and sentencing judge *could* consider the entire record [the Rule 61 record] and reach a reasoned determination to give either a life or a death sentence."[119] That conclusion highlights the heart of our differences. The dissent also states that:

When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer ... *would have* concluded that the balance of aggravating and mitigating circumstances did not warrant death.[120]

The Majority Opinion focuses on whether the additional postconviction hearing mitigation evidence *would have*—not *could have* or *might have* or it is possible that [it would have]—resulted in a rebalance of the aggravating and mitigating evidence such that death was not warranted. We cannot agree that the Dissent correctly states the law or our role as an appellate court.

Second, we agree with the Dissent that the *Strickland* standard is not "mathematically precise." [121] We disagree, however, with the suggestion that an appellate court analyzing the prejudice standard must find prejudice when given additional mitigating evidence that "could" make a difference. Were we to accept this position, the outcome that "would" occur becomes the functional equivalent of equipoise and the tie goes to the runner.

■ This Court should—indeed, must—adhere to the words articulated by the United States Supreme Court in *Strickland*. It is not appropriate for us, nor are we free, to recraft the standard to make it more to our liking. We, as noted *supra*, have reviewed the aggravating factors in light of the new mitigating evidence and conclude that there is no reasonable probability that a sentencing judge *would* have concluded that the balance of aggra-

117. Dissent at 870–71.

118. Dissent at 871.

119. Dissent at 887.

120. Dissent at 869 n. 126 (quoting *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (emphasis added).

121. Dissent at 874–75.

vating and mitigating circumstances did not warrant death. We so conclude after "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence"[122] in the postconviction relief hearing.

Moreover, we focus solely on the facts actually presented at the hearing, as we believe a reasonable sentencing judge must do, rather than speculate about what might be believed or what might have occurred, despite the absence of record support. An illustrative example of how the Majority Opinion and the Dissent differ is over the harsh fact that Gerald threw or pushed Ploof down the stairs in the home. We consider that fact as one incident, as it is the only one the record documents. Nevertheless, the Dissent suggests the Majority Opinion look beyond the record and infer, as the Dissent does, that if it happened once, it must have happened frequently.[123] Neither we, nor in our view, any reasonable sentencing judge, would or should draw that inference. We remain confident that if a court limits its reasonable inferences to the facts that the record actually documents, there is no probability that a reasonable sentencing judge *would* (not "could") conclude, after weighing the aggravating and mitigating circumstances, that Ploof did not warrant the death penalty. The likelihood of a different result might be "conceivable" if the sentencer (like the Dissent) drew every possible inference from the facts in the defendant's favor—however, such a likelihood falls well short of "substantial."[124] Both the Majority Opinion and the Dissent struggle to adapt the facts to a standard woefully lacking in precision. The Majority Opinion concludes, however, that finding prejudice sufficient to warrant a new penalty hearing under the *Strickland* standard requires more than a finding that it is "conceivable" that a reasonable sentencer rebalancing the new mix of mitigating factors against the aggravating factors would conclude that a death sentence was not warranted.

## CONCLUSION

For these reasons, we AFFIRM the Superior Court's denial of Ploof's motion for postconviction relief. Jurisdiction is not retained.

STRINE, Chancellor, with HOLLAND, Justice, dissenting.

We concur with the Majority Opinion's conclusion that the postconviction judge's decision that Ploof had not been deprived of his constitutional right to effective assistance of counsel under the standard of *Strickland v. Washington*[125] was erroneous. We write separately, however, because we respectfully disagree with the Majority Opinion's decision to uphold the postconviction judge's conclusion that the *Strickland* violation did not prejudice Ploof.

Under *Strickland*, in deciding whether Ploof was prejudiced by a deprivation of his constitutional right to effective assistance of counsel, the only determination that we are charged with making is whether there is a reasonable probability that a

---

**122.** *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

**123.** Dissent at 880 (arguing that "a reasonable sentencing judge might conclude that, if Ploof's father threw him down the stairs in full view of one of his foster sisters and beat him in front of others, he likely felt even freer to do so when they were not around").

**124.** *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011) (citing *Strickland*, 466 U.S. at 693, 697, 104 S.Ct. 2052).

**125.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

sentencing judge at a sentencing hearing would have, after hearing all of the evidence, including the testimony given by Ploof's foster sisters and Dr. Stewart at the postconviction hearing (the "Child Abuse Evidence"), given Ploof a life rather than death sentence.[126] Our role under *Strickland* is not to perform a resentencing on the appellate record. The postconviction judge went beyond the consideration of the evidence that is required by *Strickland* and instead drew factual inferences that might be appropriate for a sentencing judge to make after a sentencing hearing, but which are inappropriate under and irrelevant to the more constrained factual analysis required to determine whether prejudice under *Strickland* exists.

In his decision, the postconviction judge concluded that Trial Counsel's failure to develop the mitigating Child Abuse Evidence did not fall short of the *Strickland* standard. He further concluded that regardless of whether counsel had been ineffective, the Child Abuse Evidence was of such insufficient weight that it would "probably [not] have made any impact" at the original sentencing.[127] The postconviction judge's determination that the Child Abuse Evidence's omission caused no prejudice within the meaning of *Strickland* is not supported by the record and resulted from an incorrect application of the proper legal standard. In both his original and remand decision, the postconviction judge misapplied the prejudice standard by determining that there was no prejudice be-

cause he, in his capacity as the judge handling the petition, did not personally believe any mitigating weight should be given to evidence that a defendant (i) was raised by a father who was a sexual predator of his foster sisters; (ii) had to comfort those foster sisters and live in a house with them when he knew his father was preying on them; (iii) suffered physical and emotional abuse at the hands of his father; (iv) suffered physical and emotional abuse at the hands of his mother; and (v) was raised by a mother who did not protect him or his foster sisters from or even acknowledge the rampant sexual and physical abuse within their household.

In other words, the postconviction judge did not consider whether, when considered along with the other mitigating evidence, the Child Abuse Evidence could have led a reasonable sentencing judge to conclude that Ploof should receive a sentence of life in prison rather than death. Under the applicable standard, the test of prejudice is simply that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[128] Although this does not mean that every omission of mitigating evidence in a capital case will cause prejudice, it does mean that a new sentencing hearing is required when the omitted evidence is of sufficient weight that there is a reasonable probability—i.e., a meaningful chance or substantial likelihood—that it would cause a reasonable sentencing judge to come to a different

---

**126.** *Id.* at 694, 104 S.Ct. 2052 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."); *id.* at 695, 104 S.Ct. 2052 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."); *Porter v. McCollum,* 558 U.S. 30, 41, 130 S.Ct. 447

("To assess that probability, we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.' ").

**127.** *State v. Ploof (Ploof III),* 2012 WL 1413483, at *8 (Del.Super. Jan. 30, 2012).

**128.** *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

result.[129] If that is the case, confidence in the original outcome is sufficiently undermined that a finding of prejudice must be made.[130] *Strickland* does not require a defendant to show that the outcome "more likely than not" would have been different.[131]

Here, we conclude, after considering the undisputed evidence in the postconviction hearing record, that the Child Abuse Evidence was of sufficient weight that a reasonable sentencing judge could have reached a different balance and concluded that the mitigating evidence outweighed the aggravating. The record does not support a conclusion that a reasonable trial judge would have had no option other than to sentence Ploof to death despite the serious child abuse he suffered and its possible effects on his character and capacity to make moral decisions. A reasonable sentencing judge could choose to give Ploof a life sentence because the Child Abuse Evidence, along with the evidence regarding Ploof's lengthy history of military service, could have mitigated the punishment he should receive for the indisputably unjustified and pre-meditated murder of his wife for pecuniary and other personal gain. In other words, a reasonable judge could find that the Child Abuse Evidence was an important explanatory and mitigating factor that, when added to the evidentiary record, weighed in favor of a life sentence. That would especially be the case if the jury advised in favor of life or only rendered a non-unanimous recommendation in favor of death.

We explain these conclusions more fully in the rest of this opinion. First, we describe the relevant factual and procedural background of the case. Then we explain why we believe the postconviction judge's decision—that Ploof did not suffer prejudice as a result of his trial counsel's failure to investigate and present the mitigating Child Abuse Evidence—was erroneous. Finally, we address the Majority Opinion's affirmance of the postconviction judge's determination that Ploof did not suffer prejudice. Because the postconviction record of new mitigating evidence is of sufficient strength that there is reasonable probability a reasonable sentencing judge would have given Ploof a life rather than death sentence if he had had a chance to consider all of the evidence, we respectfully dissent.

## I. BACKGROUND [132]

On November 3, 2001, Ploof shot and killed his wife Heidi with a single bullet to

129. *Id.* at 693–94, 104 S.Ct. 2052 (explaining that when a defendant has shown that he has been prejudiced by ineffective assistance of counsel, the outcome of the proceeding should be set aside); *Hooks v. Workman*, 689 F.3d 1148, 1208 (10th Cir.2012) (ordering resentencing in a death penalty case after concluding that there was a *Strickland* violation); *King v. Moore*, 196 F.3d 1327, 1329–30 (11th Cir.1999) (same); *Kenley v. Armontrout*, 937 F.2d 1298, 1299 (8th Cir.1991) (same).

130. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.")

131. *Id.* at 693–94, 104 S.Ct. 2052 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.")

132. For a more detailed description of the facts surrounding Ploof's crime, see Majority Opinion at 844–45. Where the facts in this opinion are not accompanied by citations, they may be found in the five earlier opinions in this case: *State v. Ploof (Ploof I)*, 2003 WL 21999031 (Del.Super. Aug. 22, 2003), *aff'd*, 856 A.2d 539 (Del.2004) (*Ploof II*); *Ploof III*, 2012 WL 1413483 (Del.Super. Jan. 30, 2012); *Ploof v. State (Ploof IV)*, 75 A.3d 811, 2013 WL 2422870 (Del.2013); *Ploof v. State (Ploof V)*, ID No. 0111003002 (Del.Super. July 16, 2013).

her head in the parking lot of the Dover Wal–Mart. Ploof planned to take the money from a life insurance policy on Heidi that had just gone into effect and start a new life with his mistress. After murdering his wife, Ploof hid the murder weapon and attempted to mislead the police by making phone calls pretending that he did not know why his wife was home late from work. Police arrested Ploof the following day and he was indicted by a grand jury on the charges of Murder in the First Degree[133] and Possession of a Firearm During the Commission of a Felony.[134]

Ploof pled not guilty, and he claimed that his wife had committed suicide in his presence in the parking lot. The jury did not credit this theory and convicted Ploof on both charges. The trial then proceeded to a sentencing hearing under 11 *Del. C.* § 4209(b). The jury in a sentencing hearing of an adult convicted of first-degree murder must first decide whether the evidence shows the existence of at least one statutory aggravating factor beyond a reasonable doubt, and second, make a recommendation regarding whether all the aggravating evidence outweighs the mitigating evidence.[135] If the jury unanimously finds that one statutory aggravating factor exists, the judge shall consider the jury's recommendation and shall impose the death penalty if she decides for herself that the aggravating evidence outweighs the mitigating evidence.[136]

At Ploof's sentencing hearing, the jury unanimously found that Ploof had murdered his wife for pecuniary gain, which is a statutory aggravating factor.[137] The judge also found that the state had proven the existence of the following non-statutory aggravating circumstances: the murder was without provocation; the victim was helpless; Ploof had been disciplined in prison for several minor offenses and a major offense involving possession of a shank, which Ploof claimed was an etching device; Ploof had been disciplined by the military for having an affair;[138] Ploof had a criminal record for theft of a tractor and was arrested but not prosecuted for conduct that would have amounted to assault in the third degree of a prior girlfriend;[139] and Heidi's death had a significant effect upon her surviving relatives who loved her and missed her dearly.[140]

Ploof's mother, Shirley, was the only witness to testify regarding his childhood or family history and Trial Counsel did not offer any other evidence related to Ploof's upbringing at the sentencing hearing. Shirley testified that Ploof has a brother, Kevin, who has cerebral palsy and is physically and mentally handicapped.[141] Shirley also testified that, during a period of around eight years during Ploof's childhood, over thirty foster children, many of whom had behavioral problems, lived with the Ploof family.[142] When asked about the manner in which she disciplined her children, Shirley stated that "if [Ploof or Kevin] asked for a slap, they got it."[143] When asked whether she disciplined the foster children by giving them "a whack on the

---

133. 11 *Del. C.* § 636.

134. *Id.* § 1447A.

135. *Id.* § 4209(c)(3).

136. *Id.* § 4209(d)(1).

137. *Id.* § 4209(e)(1)(*o*).

138. *Ploof I*, at *3.

139. *Id.*

140. *Id.*

141. Penalty H'rg Tr. 9, June 18, 2003.

142. *Id.* at 14–15.

143. *Id.* at 17.

butt," Shirley indicated that she did discipline them in that manner, but affirmatively stated "I didn't hit them." [144] From this testimony, the sentencing judge found that the only mitigating circumstance related to Ploof's family history was the following:

> The defendant grew up in difficult family circumstances with a physically handicapped and mentally retarded brother, Kevin. His parents devoted much of their time to Kevin and to thirty foster children they took into their home. The defendant has a good relationship with his family members and can be a positive influence for them, particularly his brother.[145]

One gets the impression after reading Shirley's testimony and the sentencing judge's findings that, while Ploof's family circumstances might have been difficult because of his "physically handicapped and mentally retarded brother" and the constant stream of foster children cycling through his home, his parents were generally loving and nurturing individuals and his childhood was otherwise normal. And, although Shirley's disciplinary methods might have seemed outdated, there was nothing to indicate to the sentencing jury or judge that Shirley abused her children. Rather, Shirley portrayed herself as a loving mother of the old school, strict variety. Furthermore, there was no testimony at the sentencing hearing regarding Ploof's father's relationship or interactions with his children. Shirley only briefly mentioned Ploof's father during her testimony. She testified that he was employed as a "tractor trailer truck driver" and that he also had jobs in "building" during Ploof's childhood.[146]

In addition to the mitigating circumstances related to Ploof's family, the sentencing judge found that Trial Counsel had established the following additional mitigating circumstances: Ploof served almost twenty years in the U.S. Air Force and had been awarded numerous commendations and service medals, Ploof lacked a substantial criminal record and had no prior felony convictions, Ploof was capable of following rules and regulations and had the potential to do well in a structured prison environment, Ploof's family and loved ones would be seriously affected by his execution, and Ploof had expressed remorse for killing Heidi.[147]

The jury unanimously found that the aggravating circumstances outweighed the mitigating circumstances. The sentencing judge recognized that he was not bound by the jury's recommendation, but nevertheless believed that he should give it "great weight," and imposed the death sentence.[148]

At the postconviction hearing, the court heard testimony that painted a drastically different portrait of the Ploof family home than that depicted by Shirley at the sentencing hearing. The evidence developed by Ploof's postconviction counsel and presented at the postconviction hearing, if accepted as true, shows that Ploof was raised in an appalling environment that a reasonable mind could conclude seriously affected his moral development and character.

Ploof's parents had raised thirty-three female foster children in their home in Poughkeepsie, New York, until the home was forcibly shut down by New York authorities in response to allegations that Ploof's father, Gerald, was sexually abus-

144. *Id.* at 17.

145. *Ploof I,* at *3.

146. Penalty H'rg Tr. 12.

147. *Ploof I,* at *4.

148. *Id.* at *4–5.

ing the foster children. Ploof's postconviction counsel contacted six of the foster children who had lived with Ploof's family and they agreed to testify. The court heard testimony from Ploof's foster sisters that Gerald had beaten Ploof when he was a child, that Shirley had abused Ploof's "physically handicapped and mentally retarded brother" and on one occasion had broken his arm by twisting it behind his back, that Gerald sexually abused the foster girls living with the Ploof family while Shirley looked the other way, and that Ploof had witnessed Gerald's sexual abuse of his foster sisters. There was also testimony that Ploof took steps to protect his foster sisters from Gerald's physical and sexual abuse [149] and tried to comfort them when they were victimized.[150] According to their testimony at the postconviction hearing, the Ploof home was a "sterile and cold"[151] place of "fear"[152] that the girls were "scared to death"[153] to be in. Ploof's expert witness testified that this abusive upbringing likely had a negative effect on Ploof's character and moral development.[154]

Three of the foster sisters described the physical abuse that Gerald would inflict on Ploof. One foster sister testified that when Gerald was in a "mood," Ploof would try to protect the girls by telling them to get out of the house and go on walks and that when they would return from these walks they would hear Gerald yelling loudly while Ploof cried and that they "could hear the hands hitting the flesh."[155] When asked how often Gerald hit Ploof, she testified that it happened three or four times a week.[156] A second foster sister described the relationship between Gerald and Ploof as "abusive" and testified that she would see Gerald go down to the basement where Ploof's bedroom was located carrying a belt and then she would "hear the belt hitting him" and that it sounded like a "snap across his body."[157] Another foster sister testified that Gerald hit Ploof on a "regular basis" and that Gerald would punch Ploof with a closed fist and push him; she also testified that she once saw Gerald throw Ploof down the stairs.[158] She testified that Gerald physically abused Shirley as well, stating that he would "punch her in the face, hit her, pull her arms, slap her, [and] push her into walls."[159]

Ploof's foster sisters also testified that while they lived in the Ploof house they were sexually abused by Gerald. Their testimony described the ways in which Gerald exposed himself to,[160] groped,[161]

149. A89–91 (Deyo).

150. A905:10–16 (Goodwin).

151. A57:5–6 (Williams).

152. A96:13–16 (Deyo).

153. A1128:20 (Paradowski).

154. A146:21–47:6 (Stewart) ("Chronic infidelity of the father and the tension between the parents and presence of a severely disabled brother, the presence of foster children coming in and out of the home, the reality of the father being sexually assaultive to these various girls at different times, the physical abuse that went on, and this overall system, if you will, of not being able to see what was really going on, how can a person, how can a child,

develop normally in that sort of setting? I don't see it as possible."); A173:2–6 (Stewart) (testifying that [Ploof's] childhood gave him very improper models for dealing with people generally, and women in particular).

155. A89–91 (Deyo).

156. A91:22–23 (Deyo).

157. A1125:23–1127:10 (Paradowski).

158. A894:15–21 (Goodwin).

159. A893:18–19 (Goodwin).

160. A40:20–41:4 (Miller) (describing one occasion, when she was between the age of four and nine years old, Gerald approached her

and sodomized his foster daughters.[162] One foster sister testified that "[Gerald] would force [her] to have anal sex and perform oral sex on him."[163] She testified that, on one of the dozens of occasions that Gerald raped her, she was "crying because it hurt and Gerald was telling [her] to shut up" when Ploof "came in the house and he saw it."[164] There is also evidence that, on at least one occasion, Ploof imitated his father's behavior by exposing himself to one of his foster sisters.[165]

Shirley joined in the abuse by beating the foster children and physically abusing Kevin.[166] On one occasion, when Shirley wanted Kevin to take a bath and Kevin didn't want to, Shirley punished him by twisting his arm so far behind his back that it broke.[167] Shirley would also punish Kevin by bending his handicapped hand backwards until he cried out in pain.[168] In addition to the physical abuse she inflicted on her own disabled son, and in direct conflict with the testimony that Shirley gave at Ploof's sentencing hearing, the foster sisters testified that Shirley slapped them and hit them.[169] They reported that Shirley was aware of both the sexual and physical abuse committed by her husband

Gerald, but she did nothing to stop it.[170] To the contrary, one foster sister testified that Shirley forced her to lose her virginity to a neighbor with "good standing" on her sixteenth birthday.[171]

But none of this Child Abuse Evidence was introduced at the sentencing hearing because Ploof's Trial Counsel had failed to discover it. As we shall explain, this powerful evidence that the Ploof household was rife with sexual, physical, verbal, and thus emotional abuse, and parental deceit would have been accepted as substantial mitigating evidence by the jury and judge who ultimately had to determine whether Ploof should receive a life or death sentence.

## II. ANALYSIS OF THE POSTCONVICTION JUDGE'S DETERMINATIONS

### a. The Postconviction Judge's Analysis Did Not Adhere To The Objective Reasonable Probability Standard Applicable Under *Strickland*

In situations where a *Strickland* violation has resulted in a failure to present mitigating evidence, the test for prejudice is whether there is a "reasonable probabili-

---

while she was watching cartoons, removed the towel that was around his waist, exposed himself to her, and asked if she wanted "to play with it."); A645:10–646:4 (Rumshottel) (testifying that Gerald would expose himself to her).

**161.** A94:23–95:3 (Deyo) (stating that Gerald would touch the girls on their "breasts and rear ends").

**162.** *E.g.,* A898:21–899:2 (Goodwin).

**163.** *Id.*

**164.** *E.g.,* A904:20–21 (Goodwin) (testifying that Ploof witnessed her rape).

**165.** *E.g.,* A646:7–11 (Ruhmshottel) (testifying that Ploof once exposed himself to her in the same manner as Gerald).

**166.** *E.g.,* A63:15–64:18 (Miller).

**167.** A895:19–21 (Goodwin).

**168.** A644:18–645:4 (Rumshottel).

**169.** *See* A644:3–12 (Rumshottel) (testifying that on one occasion Shirley hit her twice in the stomach with a closed fist); A64:5–8 (Williams) (testifying that Shirley slapped her and one of the other foster girls and called them whores in the middle of the mall).

**170.** *E.g.,* A92:12–93:3 (Deyo) (testifying that Shirley would be in the house while Gerald was beating Ploof and that she would do "nothing" about it); A903:19–20 (Goodwin).

**171.** A930:4–21 (Goodwin).

ty" that the result of the penalty phase would have been different.[172] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[173] Although this standard is not mathematically precise, it clearly does not require that it be more likely than not that a different sentence would have resulted had the missing mitigating evidence been considered. Rather, a finding of prejudice is required if there is a substantial likelihood that a reasonable sentencing authority would have reached a different conclusion if it had the chance to consider the missing mitigating evidence.[174] In simple, common sense terms, a reasonable probability means that there is a meaningful chance that the new evidence would have caused a reasonable sentencing authority to give a different sentence. This inquiry is an objective one that focuses on what effect the evidence could have on a reasonable sentencing authority. The United States Supreme Court focused on the objectivity of the prejudice test in *Strickland* when it stated:

> The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.[175]

The Delaware General Assembly has adopted a statutory regime to handle crimes for which a death sentence may be imposed that invests the ultimate sentencing discretion in the judge, not the jury.[176] But the judge's exercise of discretion comes only after the jury provides her with its own views.[177] Therefore, the jury retains an important role in our statutory sentencing regime. In every case, as a pre-requisite to invoking that judicial discretion at all, the jury must find unanimously that one statutory aggravating factor exists.[178] If it does so, the jury must make a recommendation whether all the aggravating circumstances outweigh the mitigating circumstances.[179] The judge then considers the jury's recommendation, giving it what weight she deems appropriate,[180] and decides for herself whether the aggravating circumstances outweigh the mitigating circumstances.[181] In the case where the sentence imposed by the judge differs from the jury's recommendation, the statute further requires that the judge "state with specificity the reason for its decision not to accept the jury's recommendations."[182] If the judge ultimately

---

172. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

173. *Id.*

174. *See Cullen v. Pinholster*, — U.S. —, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011); *Harrington v. Richter*, — U.S. —, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011).

175. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

176. 11 *Del. C.* § 4209(d).

177. *Id.* § 4209(b)(1)-(2) (providing that a sentence hearing with a jury "shall" be conduct-

ed after the defendant is convicted of first degree murder by a jury or by the court).

178. *Id.* § 4209(c)(3)(b)(1). This is true except in the rare case where the sentencing jury "is waived by the State and the defendant." *Id.* § 4209(b)(2).

179. *Id.* § 4209(c)(3)(b)(2).

180. *Id.* § 4209(d)(1).

181. *Id.*

182. *Id.* § 4209(d)(4).

finds that the aggravating circumstances outweigh the mitigating circumstances, she must impose a death sentence.[183] If she reaches the opposite conclusion, the defendant is sentenced to life without parole.[184]

The question of whether Ploof has suffered prejudice under *Strickland*, then, is whether there is a substantial likelihood that a reasonable sentencing judge might have arrived at a different result when weighing the aggravating circumstances of Ploof's crime against the mitigating circumstances.[185] To make this determination, the court hearing a petition for postconviction relief must consider all the relevant facts, because "a process that accords no significance to relevant facets of the character and record of the individual offender ... excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." [186] Accordingly, the court must add the missing mitigating evidence to the mix and reweigh the aggravating and mitigating circumstances to determine whether a reasonable judge might have sentenced Ploof to life rather than death.[187] This reweighing is not itself a sentencing decision.[188] Rather, if the postconviction court's reweighing supports the conclusion that there is a meaningful chance that a reasonable sentencing judge would have decided that the mitigating evidence outweighed the aggravating evidence and given a life sentence, the sentence should be vacated so that a new sentencing hearing is conducted in conformity with the statute.[189]

**183.** *Id.* § 4209(d)(1)-(4).

**184.** *Id.*

**185.** *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**186.** *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

**187.** *Norcross v. State*, 36 A.3d 756, 769–70 (Del.2011) (citation omitted); *see also Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**188.** In an analogous context, the United States Supreme Court vacated a court of appeals decision denying a habeas petitioner a certificate of appealability from a district court decision denying his habeas petition. *Tennard v. Dretke*, 542 U.S. 274, 287, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004). The key issue in that case was whether mitigating evidence regarding the defendant's mental capacity (e.g., that he had an IQ of only 67) was improperly prevented from being considered by the sentencing jury. The Fifth Circuit had held that the exclusion of the evidence did not violate the defendant's Eighth Amendment rights because the evidence did not indicate that the defendant had a "severe permanent handicap" and that his criminal act was attributable to that handicap. *Id.* at 281, 124 S.Ct. 2562. The Supreme Court disagreed with that reasoning, stating:

> [A] state cannot bar the consideration of evidence if the sentence could reasonably find that it warrants a sentence less than death. Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence.... We have never denied that gravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability. However, to say that only those features and circumstances that a panel of federal appellate judges deems to be "severe" ... could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it "might serve as a basis for a sentence less than death." *Id.* at 284–87, 124 S.Ct. 2562 (internal citations omitted).

**189.** *See, e.g., Hooks v. Workman*, 689 F.3d 1148, 1208 (10th Cir.2012) (ordering resentencing in a death penalty case after concluding that there was a *Strickland* violation); *King v. Moore*, 196 F.3d 1327, 1329–30 (11th Cir.1999) (same); *Kenley v. Armontrout*, 937 F.2d 1298, 1299 (8th Cir.1991) (same).

The postconviction judge, while purporting to apply the correct standard for prejudice,[190] wrote a supplemental decision on remand that seemed to be more a statement of what sentence he personally would have imposed on Ploof if he were assigned to conduct a new sentencing hearing than a determination of whether there was a reasonable probability that a reasonable sentencing judge assigned that responsibility would have given Ploof a life sentence, after considering the Child Abuse Evidence as part of the evidentiary mix.[191] That subjective approach was inconsistent with the objective focus in *Strickland* on what effect the missing evidence would have on a reasonable sentencing authority.[192]

Although the postconviction judge reviewed much of the Child Abuse Evidence, he focused on the fact that much of the evidence involved Gerald's serial sexual victimization of Ploof's foster sisters and thus "only sparingly touched upon defendant Ploof." [193] That is, because Ploof was not himself sexually victimized by his fa-

ther and his crime did not involve sexual abuse, the postconviction judge concluded that it had little or no relevance to a sentencing judge evaluating what punishment to give Ploof.[194] Indeed, the postconviction judge at one point attempted to curtail questioning of the foster sisters about the abuse they suffered, even though they had voluntarily come to the hearing to testify about their experiences in the Ploof home.[195] Despite the foster sisters' voluntary testimony, the postconviction judge even drew the inference that the sentencing jury would have held it against Ploof that they had to testify about the painful abuse they endured from Ploof's parents.[196] The possibility that another reasonable sentencing judge might conclude that having a serial sexual predator as a primary role model and having to witness his father's repeated victimization of his foster sisters might have a meaningful impact on the defendant's moral character and capacity to distinguish between good and evil was ruled out categorically by the postconviction judge.[197]

190. *Ploof V*, at 10 (concluding that Ploof "failed to show a reasonable probability of a different outcome").

191. *Ploof V*, at 6 ("I cannot find anything in her testimony that would have swayed a jury, which had just determined that defendant Ploof was a liar who had killed his wife for pecuniary gain."); *id.* ("I found then, and find now, that her testimony would not have been beneficial in the mitigation phase. Indeed a jury could every bit as likely have been incensed that defendant Ploof had dragged this woman through testimony."); *id.* at 7 (discounting the testimony of one of the foster sisters because "there was nothing endearing mentioned about [Ploof], nothing arousing sympathy."); *id.* at 8 (expressing his opinion that "It caused these women great discomfort, which was visible and palpable, to be forced to recall it at all, which more likely than not would have hardened a jury against defendant Ploof even more.").

192. *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052.

193. *Id.* at 8.

194. *Id.* at 9 ("[I]t should be kept in mind that defendant Ploof was not charged with or convicted of serially sexually abusing females, a character defect that could be traced to his having been subject to the despicable practices of his father, at whose foot he was 'taught' that such actions were tolerable.").

195. A75:1–78:1.

196. *Ploof V*, at 8 (expressing his opinion that "It caused these women great discomfort, which was visible and palpable, to be forced to recall it at all, which more likely than not would have hardened a jury against defendant Ploof even more.").

197. *Ploof V*, at 9. ("Other than the commonality that either activity is illegal, there is no evident connection between the two at all.").

The postconviction judge also slighted the testimony that the defendant had comforted some of his foster sisters after they were victimized by his father.[198] Likewise, the postconviction judge gave no consideration of what effect it might have had on Ploof's character and capacity for moral decision-making to have been raised in a household where his mother tolerated the abuse of her foster daughters and no one was permitted to talk about the rampant sexual abuse. The postconviction judge instead focused on whether any of this evidence would "endear" Ploof to the jury and sentencing judge.[199] But that has little relevance to the real issue, which is whether being raised in this environment might have an effect on the defendant that a reasonable mind could consider as mitigating toward the imposition of a life, rather than death sentence. Perhaps most importantly, several of the foster sisters testified that Ploof himself was the victim of repeated physical, verbal, and emotional abuse by his father, as well as his mother.[200] The postconviction judge did not give any weight to this important evidence, which undermined the reliability of his analysis.[201]

### b. Because the Postconviction Judge Did Not Perform The Required Prejudice Analysis, This Court Must Reweigh The Evidence To Consider How the Child Abuse Evidence Alters The Evidentiary Mix

Because even after remand the postconviction judge did not engage in a reweighing of the evidence that took into adequate account the physical, verbal, and emotional abuse Ploof directly suffered at the hands of his parents, and did not consider whether it could have led a reasonable sentencing judge to give a different sentence, this Court must do so itself to consider whether there was prejudice.

Such a reweighing, in our view, starts with an acknowledgment that Ploof planned and carried out the murder of his wife to recover insurance proceeds and spend them on a new life with another woman.[202] Ploof's attribution of his wife's death to a suicide he witnessed and his lack of acceptance of responsibility are legitimate factors that any reasonable jury and sentencing judge could consider in reaching a conclusion that Ploof was not genuinely remorseful for his acts. But, in determining whether those aggravating factors supported the imposition of a death sentence, the jury and the sentencing judge would have to weigh them against the mitigating evidence in the record, to make the ultimate determination of balance the statute requires.[203] As the United States Supreme Court has made clear, "[m]itigating evidence is '*any* aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"[204]

---

198. *Id.* at 8 ("[Ploof] and the witness would have 'heart-to-heart talks,' and defendant Ploof would comfort her. This testimony ... described a bizarre and abuse [sic] circumstance for the foster girls, and a picture of a maturing defendant Ploof as a comforter. Other than that, it referenced Ploof very little.").

199. *Id.* at 7 ("[T]here was nothing endearing mentioned about the defendant, nothing arousing sympathy ...").

200. *E.g.,* A91:22–23 (Deyo); A894:13–A895:14 (Goodwin).

201. See generally Ploof V.

202. *Ploof V,* at *2.

203. 11 *Del. C.* § 4209(d).

204. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion).

In that balance, therefore, the jury and sentencing judge would be required to consider the reality that Ploof's life had not been without value to his nation. Although the original sentencing hearing evidence on even this point was less complete than the circumstances likely called for, the fact that Ploof had served in our nation's Air Force for 20 years was presented as was the fact that he had been awarded numerous commendations and service medals.[205] There were blemishes on Ploof's record,[206] but the underlying reality is that Ploof had given two decades of service to his nation in the Air Force. A reasonable sentencing judge charged with making the decision whether to give a life or death sentence·could give that service great weight.

The addition of the Child Abuse Evidence to the evidentiary mix becomes potentially important and outcome-influencing in part precisely because it could give a reasonable jury and sentencing judge a better insight into why a veteran airman might commit and lie about such a horrible crime. In this calculus would be the reality that the jury and sentencing judge were not considering whether Child Abuse Evidence should excuse Ploof from punishment at all. Rather, they were considering whether that evidence of serious child abuse should be given important weight in determining whether Ploof should be executed for his horrible crime or spend the rest of his life in prison.[207]

## III. ANALYSIS OF THE AFFIRMANCE OF THE POSTCONVICTION JUDGE'S DECISION

### a. An Appellate Court Must Make A Limited *Strickland* Prejudice Analysis

The postconviction judge did not give proper consideration to the Child Abuse Evidence in reaching the determination that the addition of that evidence to the sentencing hearing record could have led a reasonable judge to give a life rather than death sentence. The Majority Opinion's thorough and careful examination of the record relies to no discernible extent on the analysis of the postconviction judge. Instead, the Majority Opinion addresses aspects of the record the postconviction judge ignored or slighted.[208] In reviewing the postconviction judge's decision, this Court cannot draw factual inferences and make determinations about the evidentiary weight of the Child Abuse Evidence that go beyond what is proper to determine whether there is prejudice under *Strickland*. Appellate judges should not make these ultimate decisions solely on factual inferences drawn from a paper record. As this Court acknowledged, a judge who "had the advantage of hearing live testimony" is "in a better position than are we to reweigh the aggravating evidence against the sum of the mitigating evidence presented." [209]

These ultimate inferences and determinations of fact are ones that a reasonable

---

205. *Ploof I,* at *4.

206. *See supra* notes 10–11.

207. 11 *Del. C.* § 4209(d).

208. *See e.g.,* Majority Opinion at 860–61 (stating that "Shirley bent Kevin's arm back and once broke his arm," a fact which was ignored by the postconviction judge, but then apparently drawing the inference that Ploof

might not have been aware of that fact because "neither former foster girl who witnessed this abuse testified that Ploof was aware of it"); *Id.* at 860 (describing testimony, which was ignored by the postconviction judge, from three foster sisters which indicated that Gerald beat Ploof when he was a child).

209. *Ploof IV,* at *15.

sentencing judge might permissibly make after holding a new hearing and receiving the required advisory vote of a jury. But a reasonable sentencing judge and jury would also be within their discretion to reach different ultimate determinations based on the Child Abuse Evidence and its effect on the evidentiary balance relevant to what sentence Ploof should receive. The issue before this Court is only whether the new mitigating evidence tilts the evidentiary mix such that there is a meaningful chance a reasonable judge would choose to give Ploof a life sentence.[210]

For example, the Majority Opinion implicitly recognizes that the postconviction judge did not give any weight to the evidence that Gerald physically and emotionally abused Ploof and undertakes its own consideration of that Evidence.[211] The Majority Opinion then seems to draw the factual inference that the only abuse suffered in the Ploof home was that specifically testified to at the Rule 61 hearing. For example, the Majority Opinion says this about the physical abuse committed on Ploof by Gerald: "[T]hree of the six former foster girls testified that Gerald beat Ploof—with his hand or a belt. But, there is no testimony or medical record indicating that these beatings led to scars or bruises. Testimony that Gerald once threw Ploof down a flight of stairs is more

significant, but there is no evidence that this occurred more than once."[212]

A reasonable sentencing judge who heard testimony from Ploof's foster sisters that they witnessed and heard Gerald seriously physically abusing Ploof might conclude that the instances they specifically testified to were not the only instances of abuse committed by Gerald, but were instead indicative of how Ploof was regularly treated throughout his entire childhood. In fact, a reasonable sentencing judge might conclude that, if Ploof's father threw him down the stairs in full view of one of his foster sisters and beat him in front of others, he likely felt even freer to do so when they were not around. Thus, a reasonable sentencing judge could conclude that Gerald regularly subjected Ploof to physical abuse, especially because one of the foster sisters testified that Gerald beat Ploof three to four times a week.[213]

Even without testimony that Ploof's foster sisters saw bruises on Ploof's body, the mere testimony that they heard the sound of fists hitting flesh and a leather belt snapping across Ploof's body as Gerald beat him could still lead a reasonable sentencing judge to conclude that Gerald's physical abuse caused Ploof serious and enduring harm. The sadistic are not necessarily without cunning and a reasonable sentencing judge could have inferred that

**210.** *See Porter v. McCollum*, 558 U.S. 30, 43, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (finding that "[t]he Florida Supreme Court, following the state postconviction court, unreasonably discounted the evidence of [the defendant's] childhood abuse and military service," and noting that "[w]e do not require a defendant to show that counsel's deficient conduct more likely than not altered the outcome of his penalty proceeding, but rather that he establish a probability sufficient to undermine confidence in [that] outcome.") (internal citations omitted).

**211.** Majority Opinion at 860 (describing the testimony related to Gerald's abusive behav-

ior towards Ploof); *Id.* at 861 (making inferences about the severity of the abuse that Ploof suffered based on the fact that his foster sisters only testified that he was only beaten with Gerald's "hand or a belt" and based on the fact that none of the girls testified that they observed scars or bruises and no medical records to that effect were introduced at the postconviction hearing).

**212.** Majority Opinion at 861–62.

**213.** Majority Opinion at 848–49; *see also* A91:22–23 (Deyo).

the foster sisters did not testify that they saw bruises on Ploof's body because Gerald struck Ploof on parts of his body typically covered by clothing. What is most important, however, is that the record does not support a conclusion that this evidence could not have been given great mitigating weight by a reasonable sentencing judge. A sentencing judge presented with this evidence easily could have concluded that Gerald subjected Ploof to physical abuse on a regular basis, and that this abuse could have affected Ploof's own moral development and character.

The evidence that Gerald was a serial sexual predator who regularly victimized Ploof's foster sisters by raping, sodomizing, groping, and otherwise violating them cannot be discounted simply because Gerald did not sexually molest Ploof himself.[214] That does not mean that Gerald's sexually abusive conduct toward Ploof's foster sisters was not also emotionally abusive of Ploof and seriously injurious to his character development. To have one's father sexually violate your sisters over and over again, to know that it was going on while your mother looked the other way, to have to comfort them afterwards, and to be helpless to stop it, is not something any child should have to endure. A reasonable sentencing judge could have found this to have harmed Ploof in a substantial way.

A reasonable sentencing judge could also conclude that Ploof was aware of more than the specific instances of abuse which his foster sisters testified that he witnessed.[215] The evidence that Shirley broke his brother Kevin's arm cannot be discounted simply because no one testified that Ploof was aware of the incident[216] and the testimony of one of Ploof's foster sisters regarding the sexual abuse that Gerald inflicted on her remains important even though she stated that "Ploof did not witness" the abuse.[217] All of this abuse occurred within the close confines of Ploof's childhood home.[218] A reasonable sentencing judge could have concluded from the record that Ploof had a general awareness of the pervasive physical, sexual, and emotional abuse that was occurring in his home even if he didn't actually see everything that happened.

A determination that Ploof was generally aware of the abuse would be supported by testimony given by the foster sisters that Ploof witnessed several instances of Gerald's sexual misconduct,[219] comforted the victims afterward,[220] and on other occasions tried to protect them from Gerald having a chance to victimize them.[221] This

---

214. Majority Opinion at 862 ("[T]he evidence of Gerald's misconduct are of lesser mitigating value to Ploof, because Gerald's sexual abuse did not directly involve Ploof.")

215. Majority Opinion at 860–61 ("More significant is evidence that Shirley bent Kevin's arm back and once broke his arm, but neither former foster girl who witnessed this abuse testified that Ploof was aware of it."); *id.* at 861 (discounting testimony given by one foster sister because "Ploof did not witness any of Gerald's improper conduct toward her").

216. Majority Opinion at 860–61.

217. Majority Opinion at 861 ("Paradowski stated, however, that Ploof did not witness any of Gerald's improper conduct towards her.")

218. *See e.g.* A929:13 (Goodwin) ("[W]e had contact. We lived in the same home."); *Id.* at A903:19–904:2 (testifying that Shirley knew about Gerald's sexual abuse because "it was an older house and Gerald would come up the stairs, and every time you'd walk up the stairs, they would creak and you knew. And Shirley was in her room and Gerald's not there.")

219. *E.g.*, A 904:20–21 (Goodwin) (testifying that Ploof witnessed her rape).

220. A905:10–16 (Goodwin).

221. A89–91 (Deyo).

is evidence that a reasonable sentencing judge might conclude showed that Ploof was aware that his father was sexually abusing his foster sisters on a regular basis. A reasonable sentencing judge could also have inferred from the testimony given by Ploof's foster sisters that, even though they didn't see Gerald hit Ploof, they could "hear" the sounds of Gerald yelling and hitting Ploof with his hands and a belt while Ploof cried that Ploof, who lived in the same home, could also hear the abuse that Shirley and Gerald doled out on his brother and foster sisters. Thus, a reasonable sentencing judge could have concluded that everyone in the Ploof household was aware of the open secret that Gerald frequently sexually abused his foster daughters.

Likewise, the fact that Shirley abused both of her sons and her foster daughters cannot be discounted on the grounds that it simply provides additional details which fill out the portrait of Ploof's mother that had been painted at the original sentencing hearing.[222] At that hearing, the jurors and sentencing judge heard evidence that Shirley slapped her children and spanked her foster daughters until she was told not to do so, but "she denied otherwise hitting them."[223] The record includes the additional testimony that Shirley slapped two foster girls, hit a third in the stomach, and once bent Kevin's arm back until it broke. Although we acknowledge that none of the foster sisters directly testified that Ploof

was aware that Shirley broke Kevin's arm, a reasonable sentencing judge could still determine that Ploof, who lived in the same house with Shirley, Kevin, and the foster sisters, would have been aware, like they were, that his brother's arm was broken and, like the foster sisters, would have known that Shirley was responsible.

The evidence regarding Shirley presented at the postconviction hearing is starkly different than the portrayal she gave of herself at Ploof's original sentencing hearing. At that hearing, the jury and sentencing judge were led to believe that Shirley was merely an old school disciplinarian with a stern and sometimes physical parenting style, but one motivated by love. The fact that, while Shirley admitted to spanking the foster girls, she denied otherwise hitting them, contributed to this depiction of Shirley.[224] The jury and sentencing judge were not told that Shirley regularly punished Ploof's handicapped brother by bending his hand backwards until he cried out in pain,[225] that on one occasion she twisted his arm so far behind his back that it broke,[226] or that she was "indifferent," "unemotional," and "cold."[227] Furthermore, the depiction of Shirley at the original sentencing hearing would have been considered by the sentencing judge and jury in the context of a home environment that was generally portrayed as ordinary and loving. When the evidence of Shirley's actions and her stern parenting

222. Majority Opinion at 860 ("The evidence of Shirley once slapping two foster girls and hitting a third is not of material value, because Shirley had already admitted to slapping Ploof and Kevin at trial. Adding new testimony that Shirley also slapped or hit three foster girls once in the course of several years adds little to the evidentiary mix.")

223. Majority Opinion at 860 & 846.

224. Majority Opinion at 846.

225. A644:18–21 (Paradowski) ("[W]hen Kevin wouldn't do something that she wanted him to do, she would bend his handicapped hand backwards, you know, in. Inward like this so that he would cry out in pain.").

226. A895:19–21 (Goodwin) ("Shirley wanted Kevin to take a bath, and Kevin didn't want to take a bath. And Kevin has a bad arm, and Shirley took it and twisted it behind him and broke his arm.")

227. A93:3 (Deyo).

style are combined with the evidence of Gerald's physical, sexual, and emotional abuse, the overall picture of the Ploof family home is drastically different from that portrayed at the original sentencing hearing.

The portrait of Shirley painted post-trial is not that of an old school disciplinarian who might have used some techniques that are now out of vogue. It is of a mother who compounded the abuse suffered by Ploof at the hands of his father. This mother did not protect Ploof from his father; instead, she turned a blind eye to the abuse he suffered at the hands of his father and piled on abuse of her own, leaving Ploof a victim of the two people who were charged with nurturing and caring for him.

Put simply, the new evidence regarding Shirley was not merely cumulative but could be regarded by a reasonable judge as important and compelling. Taken together with the other new Child Abuse Evidence, it is powerful evidence that a reasonable sentencing judge could have credited in determining that Ploof was raised by two parents who subjected him to severe emotional and physical abuse.

A reasonable sentencing judge could have given this Child Abuse Evidence serious weight even though Ploof's crime was not a model of his father's or mother's behavior.[228] That conclusion is consistent with the selfish, deceitful, and dishonest nature of Ploof's behavior in murdering his wife for monetary gain and lying about that fact. The household in which Ploof was raised was led by two parents who were, if the Child Abuse Evidence is given weight, role models for deceit, immorality, and selfishness. Those characteristics were all prominent features of Ploof's horrible crime. A reasonable sentencing judge could conclude that a connection existed between Gerald's abuse of a series of foster daughters who cycled through his house and his dehumanizing use of those daughters for his own sexual gratification and Ploof's later decision to murder his wife for his own personal gain. Some parents teach their children to treat others with respect and to value all human life. A reasonable sentencing judge could conclude that Ploof learned from Gerald to objectify women and treat them as a means to his own personal ends.

The postconviction judge also appears to have made the determination that Ploof's extensive military career shows that his childhood had no serious effect on his capacity for moral judgment as an adult.[229] That is not, however, the only possible inference that a reasonable mind involved in the sentencing process could draw. For some reasonable minds, the fact that Ploof held himself together and functioned effectively within the highly structured environment of the Air Force and made a positive contribution to society would not mean that the abuse perpetrated on him by his father and mother did not adversely affect his moral development and character. In fact, a reasonable mind could consider the fact that Ploof had such a horrible childhood and poor role models, but had been

---

**228.** Majority Opinion at 863 ("[T]here is no discernible relationship between the childhood abuse and Ploof's decision two decades later to murder his wife to obtain $100,000.")

**229.** Majority Opinion at 863 ("Ploof joined the Air Force upon reaching adulthood, and he served for nearly twenty years before murdering Heidi. Both Trial Counsel and postconviction counsel emphasized Ploof's Air Force record. Although Stewart testified that Ploof's successful career was still consistent with growing up in an abusive home, the child abuse evidence carries diminished force as the years pass.... [T]he evidence's humanizing effect is lessened by the passage of time."); see also Ploof IV, at *2–3 (finding that Trial Counsel's focus on Ploof's military background, instead of the Child Abuse Evidence, was "imminently reasonable" and "made imminent sense.")

able to serve his nation in an important way as being mitigating in its totality. If a sentencing judge or jury were to take that position, it would be entirely consistent with our Nation's "long tradition of according leniency to veterans in recognition of their service." [230]

### b. Comparison Of The Child Abuse Evidence In This Case To The Mitigating Child Abuse Evidence In *Rompilla, Wiggins,* And *Williams*

The Majority Opinion attempts to distinguish United States Supreme Court precedent that can be read as supporting a conclusion that Ploof was prejudiced under *Strickland* and should receive a new sentencing hearing [231] by concluding as a factual matter that Ploof's experience in his childhood home does not rise to the level of the houses of horror experienced by the defendants in *Rompilla v. Beard,*[232] *Wiggins v. Smith,*[233] and *Williams v. Taylor.*[234] Without in any way denigrating the awful conditions that the defendants in those cases allegedly suffered, the qualitative gradations between the abuse allegedly suffered by the defendants in *Rompilla, Wiggins,* and *Williams* and that endured by Ploof in a home rife with pervasive sexual, physical, and emotional abuse is a matter upon which reasonable minds could

differ. For example, there may be no consensus whether it is worse to be in the same bed with your mother while she is having sex with an adult partner voluntarily,[235] or to witness your father sodomize your foster sister against her will. But, we are confident that no child should have to endure either experience. What we also do not think is debatable is that a reasonable sentencing judge could have concluded that Ploof was a victim of serious child abuse by both parents, abuse that involved selfish, deceitful, immoral, and violent behavior that was injurious to the development of his own capacity to make moral decisions.

The Majority Opinion's emphasis on the distinctions in the levels of abuse suffered by the defendants in *Rompilla, Wiggins,* and *Williams* is inconsistent with its own recognition of the inherently case specific nature of sentencing. Even if the home situation in those cases and the abuse suffered by those defendants was somehow worse than Ploof's home situation and the abuse that he suffered or if Ploof's low to average intelligence distinguishes him from the defendants in these cases who were less intellectually capable,[236] the aggravating factors in those cases also might have been viewed by a sentencing judge as more severe. In *Rompilla,* for example,

**230.** *Porter v. McCollum,* 558 U.S. 30, 43, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (finding that the Florida State Supreme Court failed to give sufficient weight to the importance of a defendant's military record in a determination under *Strickland* of whether a defendant had been prejudiced and reversing the defendant's death sentence).

**231.** Majority Opinion at 861–63 (attempting to distinguish United States Supreme Court precedent).

**232.** 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

**233.** 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

**234.** 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**235.** Majority Opinion at 857 (noting that in *Wiggins* "[t]he petitioner's mother had sex while her children slept in the same bed").

**236.** Majority Opinion at 862 ("Stewart did not diagnose Ploof with any mental illness stemming from his childhood. Stewart noted that Ploof exhibited average to low-average intelligence, and he indicated Ploof had 'chronic denial' regarding the abuse. In contrast, the petitioners in *Williams, Wiggins,* and *Rompilla* had severe mental problems.")

the defendant was found guilty of a murder in which he repeatedly stabbed the victim and then set the victim's body on fire during the course of a robbery.[237] In that case, the jury found that there were three aggravating factors present: the murder was committed in the course of another felony; the murder was committed by torture; and Rompilla had a significant history of felony convictions indicating the use or threat of violence.[238] In *Wiggins*, the defendant drowned a seventy-seven year-old woman in her bathtub in the course of a robbery.[239] The state medical examiner testified that the injuries on the victim's body were consistent with a struggle before her death.[240]

In *Williams*, the defendant was found guilty of murder and sentenced to death after he killed an elderly man by hitting him in the chest and on the back with a mattock, causing his rib to puncture his lung and his chest cavity to fill with blood, because the man refused to loan him $2.00.[241] After taking the man's wallet, which had $3.00 in it, Williams walked away and left the dying man on his bed, gasping for breath.[242] Williams had been previously convicted of armed robbery and grand larceny and after the murder he had been involved in two auto thefts and two separate violent assaults on elderly victims, including the "brutal" assault of an elderly woman that left her in a permanent vegetative state.[243] Williams was also convicted of arson for setting a fire while he was in jail awaiting the murder trial.[244] At

his sentencing hearing, the state employed two expert witnesses who testified that there was a "high probability" that Williams would pose a "serious continuing threat to society." [245]

It also does not appear that any of the defendants in *Rompilla*, *Wiggins*, or *Williams* had a record of positive service to the nation comparable to the service that Ploof gave as a member of the Air Force. A reasonable sentencing judge would not look at the Child Abuse Evidence in isolation to determine whether Ploof should receive a life or death sentence; she would instead examine it in the context of all the other mitigating and aggravating evidence. Focusing exclusively on a comparison of the mitigating Child Abuse Evidence in this case with the mitigating abuse evidence that was offered in *Rompilla*, *Wiggins*, and *Williams*, fails to account adequately for the fact that sentencing decisions are not made in a vacuum solely on the basis of the strength of a particular type of mitigating evidence, but instead are the result of a careful balancing of *all* of the aggravating and mitigating factors that are present in a specific case by a sentencing judge who has considered the entire record.

### c. The Original Sentencing Jury's Unanimous Recommendation In Favor Of The Death Penalty Is Irrelevant To The Current Question

The Majority Opinion also seems to view as being of importance the fact that the

237. 545 U.S. at 377, 125 S.Ct. 2456.

238. 545 U.S. at 378, 125 S.Ct. 2456.

239. 539 U.S. at 514, 123 S.Ct. 2527; *Wiggins v. State*, 324 Md. 551, 597 A.2d 1359, 1362–63 (1991).

240. 324 A.2d at 1363.

241. 529 U.S. 362, 367–68, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Williams v. Com-*

*monwealth*, 234 Va. 168, 360 S.E.2d 361, 364 (1987).

242. 529 U.S. at 368 n. 1, 120 S.Ct. 1495.

243. 529 U.S. at 368, 120 S.Ct. 1495.

244. 529 U.S. at 368, 120 S.Ct. 1495.

245. 529 U.S. at 368–69, 120 S.Ct. 1495.

jury, without considering the Child Abuse Evidence developed by postconviction counsel, unanimously recommended the death penalty.[246] But, we do not view this as predictive of how reasonable jurors might cast their vote when deciding whether to recommend a life or death sentence on the basis of a record containing the Child Abuse Evidence. The record reflects that the additional mitigating evidence was strong evidence that could be regarded by a reasonable jury and sentencing judge as compelling.

Therefore, the record does not support the Majority Opinion's certainty that "[e]ven if the new evidence created a reasonable probability that one juror would have switched sides ... the remaining jurors would have still overwhelmingly recommended the death penalty."[247] Although our statutory regime does not give the same weight to the role of jury as it used to or as other states do,[248] the jury is still important in our system. The original sentencing judge placed "great weight" on the jury's unanimous recommendation.[249] We cannot predict how influential in terms of the number of jurors recommending life as opposed to death the Childhood Abuse Evidence would be or what percentage of reasonable sentencing judges would find

that evidence supportive of awarding a life, rather than death sentence.

Thus, we have focused on the weight that *a* reasonable judge or jury could give to that evidence. Because juries are instructed to deliberate on the issues entrusted to them and encouraged to reach a principled consensus if possible,[250] it is hazardous to try to identify how many juror minds might have been swayed by serious evidence of child abuse. So long as there is a reasonable probability that a reasonable juror would have reached a different decision because of that evidence's effect on the overall record, there is no reason to assume that several jurors, a majority of jurors, or even all jurors might not have reached that conclusion after reasoning together at a new sentencing hearing. Likewise, prejudice under *Strickland* does not turn on a prediction that the sentencing judge would likely have given life if the missing evidence was in the record. Prejudice exists if the new evidence would have provided the sentencing judge with a reasonable basis for doing so.

This is important, because the ultimate determination of sentence is one that our legislature has entrusted to the sentencing judge, not the jury.[251] That reality underscores that there is prejudice under *Strick-*

---

**246.** Majority Opinion at 865 ("The jury's unanimous recommendation supports our conclusion.")

**247.** Majority Opinion at 865.

**248.** *See Brice v. State*, 815 A.2d 314, 318–20 (Del.2003) (discussing the 2002 amendments to 11 Del. C. § 4209 and comparing Delaware's "hybrid" capital sentencing scheme with that of other states).

**249.** *Ploof I*, 2003 WL 21999031, at *4 (Del.Super. Aug. 22, 2003).

**250.** *E.g.*, Pattern Criminal Jury Instructions, Del.Super. Ct., § 2.12 Conduct During Deliberations, *available at* http://courts.delaware.

gov/Superior/pattern/pattern_criminal_jury_rev_2012.pdf ("Jurors have a duty to consult with one another with an open mind and to deliberate with a view toward reaching a verdict.... You should not surrender your own opinion or defer to the opinions of your fellow jurors for the mere purpose of returning a verdict. However, you should not hesitate to re-examine your own view and change your opinion if you are persuaded by others.").

**251.** *Majority Opinion* at 865 n. 108 (indicating that the standard for determining prejudice is different in this case than in cases in states where a unanimous jury recommendation in favor of the death penalty is required because in those cases it must only be proven that one juror would have changed her vote).

*land* so long as there is a meaningful chance that a reasonable sentencing judge would give a life, rather than death, sentence taking into account the Child Abuse Evidence.

That is especially so, of course, if the jury vote was in favor of a life sentence. But experience also shows that sentencing judges use their statutory discretion to make an ultimate decision different from what the jury recommends when a jury renders a non-unanimous vote in favor of a death sentence. In thirteen prior cases in this state, sentencing judges imposed a life sentence even though the jury recommended a death sentence.

- **Baker, Meri–Ya,** (9–3 vote)
- **Cabrera, Luis,** (7–5 vote)
- **Crowe, James,** (6–6 vote)
- **Dickerson, Byron,** (9–3 vote)
- **Flonnory, Freddy,** (7–5 vote after second penalty hearing)
- **Govan, Arthur,** (jury vote on 4 counts 7–5, 6–6, 8–4, 8–4)
- **Jones, David,** (7–5 vote)

- **Keyser, Michael,** (10–2 vote)
- **Page, Darrel,** (8–4 vote)
- **Rodriguez, Jose,** (9–3 vote)
- **Simmons, Donald,** (10–2 vote)
- **Taylor, Antonio,** (6–6 vote)
- **Watson, John,** (8–4 vote) [252]

As can be plainly seen, in several of those cases, the sentencing judge did so despite supermajority jury votes in favor of a capital sentence.[253]

## IV. CONCLUSION

This is a classic situation where a reasonable jury and sentencing judge could consider the entire record and reach a reasoned determination to give either a life or a death sentence. In so concluding, we note that it is a sad reality that murder is all too common in our society. The related and important reality is that the crimes for which a death penalty is a possible sentence under our law are categorically awful and unsympathetic, because they all involve the taking of another human life, in circumstances that our General Assembly has concluded are particularly worthy of punishment.[254] Murders that could be

---

**252.** *Baker v. State*, 1993 WL 557951, at *1 (Del. Dec. 30, 1993); *State v. Cabrera*, 1999 WL 41630, at *1 (Del.Super. Jan. 21, 1999), *aff'd*, 747 A.2d 543 (Del.2000); *Crowe v. State*, 1998 WL 736389, at *1 (Del. Oct. 8, 1998); *State v. Dickerson*, Del.Super., Cr. A. No. IN90–12–1041, Toliver, J. (Sept. 30, 1992) (bench ruling), *aff'd*, 1993 WL 541913 (Del. Dec. 21, 1993); *State v. Flonnory*, 2004 WL 1658496, at *1 (Del.Super. July 22, 2004), *aff'd*, 893 A.2d 507 (Del.2006); *State v. Govan*, Del.Super., Cr. 92010166, Babiarz, J. (Oct. 14, 1993) (bench ruling), *aff'd*, 1995 WL 48359 (Del. Jan. 30, 1995); *Jones v. State*, 798 A.2d 1013, 1015–16 (Del.2002); *State v. Keyser*, 2005 WL 1331778, at *14 (Del.Super. June 3, 2005), *aff'd*, 893 A.2d 956 (Del.2006); *Page v. State*, 934 A.2d 891, 895 (Del.2007); *State v. Rodriguez*, 656 A.2d 262, 268 (Del.Super.1994); *State v. Simmons*, Del.Super., Cr. A. No. IN92–01–0770, Balick, J. (Dec. 12, 1992) (bench ruling); *State v. Taylor*, 1999 WL 462377, at *1 (Del.Super. Apr. 28, 1999); *State v. Watson*, 1993 WL 603341, at *3 (Del.Super. Mar. 19, 1993)

**253.** *See State v. Rodriguez*, 656 A.2d 262, 268 (Del.Super.1994) (life sentence given by judge after a nine to three vote by the jury recommending death); *Baker v. State*, 1993 WL 557951, at *1 (Del. Dec. 30, 1993) (life sentence given by judge after a nine to three vote by the jury recommending death); *State v. Keyser*, 2005 WL 1331778, at *14 (Del.Super. June 3, 2005), *aff'd*, 893 A.2d 956 (Del.2006) (life sentence given by judge after a ten to two vote by the jury recommending death); *State v. Simmons*, Del.Super., Cr. A. No. IN92–01–0770, Balick, J. (Dec. 12, 1992) (bench ruling) (life sentence given by judge after a ten to two vote by the jury recommending death); *State v. Dickerson*, Del.Super., Cr. A. No. IN90–12–1041, Toliver, J. (Sept. 30, 1992) (bench ruling), *aff'd*, 1993 WL 541913 (Del. Dec. 21, 1993) (life sentence given by judge after a nine to three vote by the jury recommending death).

**254.** 11 *Del. C.* § 4209(e) (listing statutory aggravating factors).

seen as involving more cruelty and evil than the one Ploof committed have resulted in the imposition of a life, rather than a death, sentence.[255]

We therefore conclude that there is a reasonable probability that a reasonable sentencing judge, considering all the evidence including the Child Abuse Evidence, would decide that a twenty-year member of our military who had served his country in many important operations, had no prior history of serious criminal activity, and who was a victim of serious child abuse should spend his life behind bars rather than be executed for committing a pre-planned murder for pecuniary gain. Under *Strickland*, therefore, the appropriate remedy is to vacate Ploof's sentence in order for him to receive a new sentencing hearing.[256]

---

**255.** *See, e.g., State v. Flagg,* 1999 WL 743458 (Del.Super. June 11, 1999) (imposing a life sentence on the defendant, who shot a husband in his home, kidnapped his wife, and raped her for several days); *State v. Cabrera,* 1999 WL 41630 (Del.Super. Jan. 21, 1999) (imposing a life sentence on a defendant who, in order to cover up a fraud scheme, broke into the victim's home with an accomplice, attempted repeatedly to asphyxiate the victim, and finally succeeded by wedging an object down his throat); *State v. Watson,* 1993 WL

603341 (Del.Super. Mar. 19, 1993) (imposing a life sentence on a defendant who, during a robbery, beat the victim to death by repeatedly smashing her head with a hammer).

**256.** *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Hooks v. Workman,* 689 F.3d 1148, 1208 (10th Cir.2012); *King v. Moore,* 196 F.3d 1327, 1329–30 (11th Cir.1999); *Kenley v. Armon- trout,* 937 F.2d 1298, 1299 (8th Cir.1991).